HOOSIER INSURANCE COMPANY, INC., Defendant-Appellant,

v.

Charles R. MANGINO and Diane S. Mangino, Plaintiffs-Appellees.

No. 1-580A131.

Court of Appeals of Indiana, First District.

April 28, 1981.

Rehearing Denied June 12, 1981.

Stephen M. Gentry, Speedway, for defendant-appellant.

L. Eric Bauer, Bauer, Miller & Bauer, Terre Haute, N. George Nasser, Terre Haute, for plaintiffs-appellees.

NEAL, Presiding Judge.

## STATEMENT OF THE CASE

Defendant-appellant Hoosier Insurance Company, Inc. (Hoosier) appeals a judgment entered in Vigo Superior Court upon a jury verdict in favor of plaintiffs-appellees Charles R. Mangino and Diane S. Mangino (Manginos) for damages resulting from a breach of contract. Hoosier challenges the trial court's judgment awarding punitive damages.

We reverse.

## STATEMENT OF THE FACTS

The facts most favorable to the judgment disclose that on the morning of December 22, 1976, a home which the Manginos were purchasing on contract from John and Norma Walker (Walkers) was destroyed by fire. Manginos lost most of their personal possessions. Several hours before the fire, which was reported at approximately 1:00 a. m., Manginos and their children had left home to visit with relatives in Ohio during the Christmas holidays.

Later, on the same day of the fire, Mrs. Mangino placed a telephone call from Ohio to Walkers in Indiana. She testified that the purpose of the phone call was to inform the Walkers of a late payment on a personal loan. During that same phone conversation, Mrs. Walker told Mrs. Mangino of the fire and how everything was lost. Sometime after Christmas day Manginos returned home to Lewis, Indiana, and made arrangements with Walkers for a new place to live.

Manginos had entered into the land sale contract on June 1, 1974. At the time of the fire, the premises were protected by a policy of insurance issued by Hoosier. Manginos were the named insureds; Walkers

were listed as mortgagees, and, as such, were co-insureds under the same insurance contract. Mrs. Walker testified that she customarily paid Hoosier the monthly insurance premium and Manginos reimbursed her.

On December 28, 1976, Manginos met with Mr. Thomas Bursott (Bursott), an insurance adjuster and branch manager of General Adjustment Bureau, Inc. Bursott had been assigned by Hoosier to handle Manginos' claim. Bursott explained to them that before he could proceed with their claim, Manginos had to sign a non-waiver agreement which provided, in essence, that the insurance policy conditions could not be waived by Bursott's investigation. Bursott then gave Manginos a proof of loss form and suggested they consult product catalogs to estimate the value of possessions destroyed in the fire. Mrs. Mangino testified Bursott had said they would receive cost of living expenses. Bursott advised Manginos to retain copies of all receipts and transactions for food and lodging since the fire.

On December 31, 1976, three days after Bursott's first meeting with Manginos, they remitted an itemized statement[1] of personal property they had lost in the fire. They also had collected unsworn statements of neighbors which described Manginos' possessions. On January 10, 1977, Bursott received a completed and notarized proof of loss form signed by Manginos which Bursott returned to Hoosier. On February 24, 1977, Hoosier sent a letter to Manginos denying its liability for the loss, stating its reason for doing so, returning an unearned premium of $75 on Manginos' indemnity policy, and voiding the policy as to Manginos.

On July 12, 1977, Manginos sued Hoosier for "a malicious breach of contract, designed to harass and oppress Plaintiffs [Manginos]." Manginos' complaint sought exemplary damages in addition to compensation for the loss. Judgment was entered upon a jury verdict in favor of Manginos awarding them legal title to the real estate, compensatory damages of $16,950, and punitive damages of $30,000.

## ISSUES

Hoosier raises four issues on review:

"I. Whether the court erred in overruling Defendant's [Hoosier's] motion for judgment on the evidence at the close of all the evidence as to the issue of punitive damages;

II. Whether the verdict of the jury and the judgment of the court thereon was contrary to law and the evidence as to the issue of punitive damages;

III. Whether the verdict of the jury and the judgment of the court thereon was supported by sufficient evidence as to the issue of punitive damages; and

IV. Whether the verdict of the jury and the judgment of the court thereon for the sum of $30,000 in punitive damages was excessive and a result of passion, prejudice and confusion."

Our resolution of Issue II is dispositive.

## DISCUSSION AND DECISION

■ Hoosier does not appeal the compensatory damage award for its breach of contract. However, Hoosier argues that the record contains no evidence of tortious conduct which would support the jury verdict on punitive damages. As a general rule, a party injured by a breach of contract is entitled to recover only the loss actually

---

1. Manginos' inventory of items included four TV sets, two stereo sets, and an entertainment console center. Also, Mrs. Mangino claimed that she had 30 pairs of shoes valued at $600, while Mr. Mangino claimed he had five suits worth $750. Manginos' testimony further disclosed that neither one of them had filed income tax returns for 1975 or 1976. Mrs. Mangino, under cross-examination, testified that her income for 1976 as a "B-drinker" in local bars was somewhere between $1,000–$5,000; and Mr. Mangino testified that he had earned between $5,000 and $7,000 by buying and selling used automobiles during 1976. The total value of all inventoried property, based upon original cost to Manginos, amounted to slightly more than $20,000. Bursott, in testimony, noted it was unusual, in his opinion, that Manginos had paid for everything in cash.

suffered. *Stoneburner v. Fletcher*, (1980) Ind.App., 408 N.E.2d 545; *Ogle v. Wright*, (1977) 172 Ind.App. 300, 360 N.E.2d 240.

In *First Federal Savings and Loan Association of Indianapolis v. Mudgett*, (1979) Ind.App., 397 N.E.2d 1002, this court wrote an extensive review of Indiana law on punitive damages arising out of a breach of contract. As we stated there and as Hoosier correctly states in its brief, the general rule is punitive damages are not recoverable in contract actions. *Hibschman Pontiac, Inc. v. Batchelor*, (1977) 266 Ind. 310, 362 N.E.2d 845; *Vernon Fire & Casualty Ins. Co. v. Sharp*, (1976) 264 Ind. 599, 349 N.E.2d 173; *Harper v. Goodin*, (1980) Ind. App., 409 N.E.2d 1129; *Southern, School Buildings, Inc. v. Loew Electric Inc.*, (1980) Ind.App., 407 N.E.2d 240; *Mudgett, supra; Standard Land Corporation of Indiana v. Bogardus*, (1972) 154 Ind.App. 283, 289 N.E.2d 803; *Murphy Auto Sales, Inc. v. Coomer*, (1953) 123 Ind.App. 709, 112 N.E.2d 589. However, where the breach also includes conduct (1) which independently establishes the elements of a common law tort such as fraud or (2) where elements of fraud, malice, gross negligence or oppression mingle in the controversy, Indiana courts will allow the imposition of punitive damages provided that the public interest is served by the deterrent effect of the punitive damages award. *Vernon Fire & Casualty Ins. Co., supra; Harper v. Goodin*, (1980) Ind.App., 409 N.E.2d 1129; *Art Hill Ford, Inc. v. Callender*, (1980) Ind.App., 406 N.E.2d 340; *Mudgett, supra; Jeffersonville Silgas, Inc. v. Wilson*, (1972) 154 Ind.App. 398, 290 N.E.2d 113.

Hoosier contends that the facts in the case at bar do not support an inference of bad faith, malice, fraud or oppressive conduct on its part. The Court of Appeals, in reviewing a jury verdict, is not to weigh evidence or resolve credibility of witnesses, but rather is limited to determining whether the verdict is sustained by substantial evidence of probative value. *Fleetwood Corporation v. Mirich*, (1980) Ind.App., 404 N.E.2d 38; *Rees v. Heyser*, (1980) Ind.App., 404 N.E.2d 1183; *American Optical Compa-* *ny v. Weidenhamer*, (1980) Ind.App., 404 N.E.2d 606; *Johnson v. Ross*, (1980) Ind. App., 405 N.E.2d 569; *Summerlot v. Summerlot*, (1980) Ind.App. 408 N.E.2d 820. We presume that the award of damages by the trial court rested upon those allegations which were sustained by the evidence. *Prudential Company of America v. Executive Estates*, (1977) Ind.App., 369 N.E.2d 1117. Only when the evidence is without conflict and leads to but one conclusion and the fact finder reached a contrary conclusion will the Court of Appeals disturb the decision as contrary to law. *Thompson v. Lee*, (1980) Ind.App. 402 N.E.2d 1309. This court, in *Harper, supra*, at 1133, described with particularity the kind of conduct that must be shown in order to permit an award of punitive damages:

> "The promisor's motive for breaching a contract is generally regarded as irrelevant because the promisee will be compensated for all damages proximately resulting from the promisor's breach. Where the facts surrounding the promisor's breach indicate substandard business conduct, the promisee may also enjoy a limited sense of requital in taking his business elsewhere in the future but he is not entitled to mulct the promisor in punitive damages.
>
> *Something more than a state of mind described as heedless disregard of the consequences is required for the imposition of punitive damages in breach of contract cases. Actual malice, or wantonness from which the law can imply malice, must be shown. The word 'reprehensible' is used, as where there is conscious and deliberate conduct. Deceit is involved. Negligent conduct or incompetence is insufficient.*" (Emphasis added.)

*See also* Appleman, *Insurance Law and Practice* § 11256; Couch, *Cyclopedia of Insurance Law* (2nd ed.) § 58:49. Upon deciding *Murphy Auto Sales, Inc., supra*, at 717–718, the Indiana Appellate Court, sitting *in banc*, stated the purpose for allowing punitive damages in contract actions as follows:

> "*Punitive or exemplary damages* do not rest upon any ground of abstract or theo-

retical justice but upon the basis of an established public policy which *seeks to promote the public safety and to punish through the medium of a civil proceeding a fraudulent wrongdoer, and where malice, gross fraud and oppressive conduct is shown punitive damages are allowable to deter other wrongdoers from offending in a like manner.*" (Emphasis added.)

Also, in *Nate v. Galloway,* (1980) Ind.App., 408 N.E.2d 1317, 1323, Judge Hoffman stated, "The purpose of such award [punitive damages] is to punish the wrongdoer and to deter others from engaging in similar conduct in the future." Quite clearly, then, punitive damages are not intended to compensate the claimant but rather to penalize the wrongdoer.

The principal issue before us it whether punitive damages will lie for Hoosier's refusal to pay Manginos' claim under the policy of insurance. Manginos contend Hoosier acted oppressively, maliciously, and in bad faith in denying their claim. Hoosier's answer and counterclaim alleged Manginos set fire to their house, misrepresented the origin of the fire, and misrepresented the amount of loss. Hoosier moved for judgment on the evidence at the close of Manginos' evidence, and again at the close of all the evidence. In its motion to correct errors, Hoosier assigned the denial of the latter *motion* as error as to the issue of punitive damages. Hoosier further argues that the verdict on punitive damages is contrary to law and not supported by the evidence.

The controlling precedent was formulated in *Rex Insurance Company v. Baldwin,* (1975) 163 Ind.App. 308, 323 N.E.2d 270, and *Vernon Fire & Casualty Insurance Company, et al. v. Sharp,* (1976) 264 Ind. 599, 349 N.E.2d 173.

In *Rex, supra,* the operative act for which punitive damages were sought against the insurance company was the refusal of Rex Insurance Company to pay the proceeds of a life insurance policy. It claimed there was a misrepresentation on the policy application by the deceased of his state of health. However, the two-year uncontesta-ble period had already run by the time of the decedent's death, and the company officials knew, as a matter of law, this provision was no longer available as a defense. This court, in affirming an award of punitive damages, said:

"We are of the opinion that the record before us reveals evidence that the policy provisions were sufficiently clear that Rex could not dispute the amount of liability in *good faith*; we are of the further opinion that from such evidence the trial court could reasonably infer the existence of heedless disregard of the consequences, malice, oppressive conduct and injury." (Emphasis added.)

163 Ind.App. at 313–14, 323 N.E.2d 270.

In *Vernon, supra,* the insurance company, while conceding liability to the assured for a sum certain for fire loss, refused to pay the claim until it had settled another employee claim. The Supreme Court upheld the award of punitive damages but noted that punitive damages will not lie where an insurance company merely causes an insured to seek a judicial determination on the question of liability provided that the contract is reasonably susceptible to more than one interpretation. The court commented:

"Appellants acknowledge the foregoing rule allowing punitive damages, but maintain that their conduct in dealing with their insured reflects nothing more than a legitimate exercise of an insurer's 'right to disagree' as to the amount of recovery, citing *Meridian Mutual Insurance Co. v. McMullen,* (1972) 152 Ind.App. 141, 282 N.E.2d 558. It is evident that the exercise of this right may directly result in the intentional infliction of temporal damage, including the damage of interference with an insured's business (which an insured will undoubtedly consider to be oppressive). The infliction of this damage has generally been regarded as privileged, and not compensable, for the simple reason that it is worth more to society than it costs, i.e., *the insurer is permitted to dispute its liability in good faith because of the prohibitive social*

costs of a rule which would make claims *nondisputable.* Insurance companies burdened with such liability would either close their doors or increase premium rates to the point where only the rich could afford insurance.

For these reasons, we agree that an insurer cannot be subjected to a punitive damage award for seeking *in good faith* to pay only the amount which the law requires to be paid under its contract. Insofar as defendants' conduct is ascribable to their good faith efforts to pay the legal proceeds, their conduct is privileged." (Emphasis added.)

264 Ind. at 609–610, 349 N.E.2d 173.

Subsequently, this court reviewed the same subject in *Mudgett, supra.* There we stated:

"Courts have long recognized that a good faith dispute as to what a contract requires of a party will never supply the grounds for punitive damages, *Jones v. Abriani,* (1976) Ind.App., 350 N.E.2d 635; that the legitimate exercise of the 'right to disagree' may directly result in intentional infliction of temporal damage; but that the infliction of such damage is generally regarded as privileged, *Vernon, supra.* Courts must be careful not to discourage honest litigation by allowing punitive damages against a party who is merely exercising his right to adjudicate an honest dispute even if he is found to be in error and even if his litigation injures the other party. 8 Ind.Law Review 668, *supra.* In *Vernon, supra,* we also stressed that a promisor's motive for breaching his contract is generally irrelevant and that even a breach indicating substandard business conduct does not entitle the promisee to mulct the promisor in punitive damages."

397 N.E.2d 1008.

From *Rex, Vernon,* and *Mudgett* we conclude that, to prevail, Manginos must show Hoosier was acting in bad faith when it denied their claim. In this context, bad faith means knowledge by Hoosier that it had no legitimate reason for denying Manginos' claim, but nevertheless refused it as

in *Rex* and *Vernon.* Absence of any reasonable grounds for denying liability is evidence from which a jury could infer malice or oppressive conduct. *Rex, supra.*

We now shall examine the facts known by Hoosier at the time it denied liability on Manginos' claim. These facts were disclosed by the evidence at trial and are largely undisputed.

Shortly after the fire was reported to Hoosier, it assigned Mr. Gary Mang, a fire investigator with INS Investigations Bureau, Inc. to examine the remains of Manginos' home. Upon completion of his investigation, Mang expressed the opinion that the fire had been of incendiary origin. Testimony from two eyewitnesses disclosed that the fire begun suddenly and had spread rapidly. Earl Tryon, one eyewitness and a neighbor to Manginos, testified as follows:

"A. Yes, sir. It's the second house south of me.

Q. Do you live on the same side of the street?

A. On the same side of the street.

\* \* \* \* \* \*

Q. Are you familiar with the fact that the residence was occupied by the Manginos' did burn on or about December 22, 1976?

A. Yes.

Q. And how did you become aware of that?

A. *Because I seen the house blow up.*

Q. Where were you located at the time?

A. I was on the sidewalk, oh, just at the beginning of the parsonage property.

Q. What time of day or night was this?

A. To the best of my ability, it would be somewhere a little before or a little after one o'clock in the morning.

Q. Now, would it be a little unusual for you to be out on the sidewalk at that time of night?

A. Not really, but circumstances leading up to it is why I was out.

Q. All right. Why were you out there?

A. On that particular night we had a very strong wind coming from the south and my wife was ill and I was up with her and she kept hearing noises and it was only the wind in the trees and I was getting ready to take her up to bed *when we heard what was approximately a shotgun blast.*

Q. What do you mean approximately a shotgun? Something that sounded like it?

A. *Something that sounded like a shotgun blast.* And I went outside to see what it was because we had been having trouble down there and I thought perhaps if there was trouble and there was a car fleeing or somebody, I'd be able to see it. I didn't see it and there was a *heavy concentration of smoke out there, oil, and what smelled to me like gasoline;* and I walked on out to the sidewalk, and they had been having trouble with the furnace next door and I started walking over towards that way to see if there was anything wrong when—

Q. You mean the parsonage furnace?

A. The parsonage, yes—when the Mangino house exploded.

Q. Now, what do you mean by it exploded?

A. *It exploded. It went 'boom'.*

Q. *Had you seen any evidence of fire prior to the time it exploded?*

A. *No. And I had been outside several times.*

Q. When you first walked out your door and onto your porch, did you see any indication of fire?

A. None whatsoever.

Q. And it was only after you started down the walk toward the parsonage that you heard and saw the explosion?

A. I started walking over to see around the parsonage if anything was wrong there and when I got to—

what I call the property line—close to the parsonage on the sidewalk, *the Mangino house exploded.*

Q. Was there a loud noise associated with it?

A. Certainly. *When it exploded, it blew all the windows out and flames—pssssshoo (witness made a gesture with his hands).*

Q. What portion of the Mangino residence was on fire when it exploded?

A. *When it exploded, everything was on fire. Fire came out all the windows and doors.*

Q. Down and up?

A. *Both upper and lower levels, yes.*

Q. What did you do then?

A. Turned around and ran back in the house and told my wife to call the Lewis Township fire department and the state police and I ran next door to the church and jerked the door open and rang the church bell because earlier in the evening the two children had been there—or I say two; all three of them may have been there; I don't know.

\* \* \* \* \* \*

Q. Prior to the explosion, do I understand your testimony to be that *you did detect an odor of fuel oil and what smelled like gasoline?*

A. *Yes, sir.*

Q. Just slightly or was it quite obvious?

A. *It was quite obvious.* Of course, as I say, the type of weather we had, the wind was coming from the south and it was a low ceiling night." (Emphasis added.)

Norman Husband, a volunteer fire fighter for Lewis Township for 12 years, who fought the blaze, testified:

"A. That was one of the hottest fires, if not the hottest, that I have ever been battling—or help battle, and this seemed like it was fed by something other than the house itself, some kind of fuel."

Following Mr. Husband's testimony, Charles Ellis, an Indiana State trooper who was the first police officer at the scene of the blaze, testified:

"Q. All right. Did you recover anything from the scene of the fire?

A. Yes, I recovered a five-gallon container that—a gas can or some type of can.

Q. And how did you become aware that there was such a can?

A. One of the firemen came over to the car where I was and told me that they had seen a *can laying out behind the house and they thought it should be brought to my attention.*

Q. What did you do?

A. Okay, I went over and recovered it and put it in my car at that time.

Q. Did you inspect it at that time?

A. Right. *I looked at it and there was a small amount of liquid in the bottom of it; I'd say a cup or less,* and it was a round silver can with no caps on it and it had a small—about an inch high paint line of blue around the top and bottom.

Q. You say there was *no cap on it of any sort*?

A. *No, sir.*

\* \* \* \* \* \*

Q. Trooper, what did you do with the can that you removed from the scene?

A. Okay, at the time I removed it I placed it in the trunk of my car and it was still in there the next day. And then after that it was taken to the post and put in the evidence locker.

Q. And the next day when you took it out of the trunk, did you observe it again at that time?

A. Yes, I did. *Before I took it out of my car, I got into my car when I went on duty and started to drive to the post and there was a strong smell of gasoline in my car—very strong—and at that time I stopped*

*and took the can out and it was in the can.*

Q. Did you smell the contents of the can?

A. Yes, I did.

Q. *And what did it smell like to you?*

A. *Gasoline.*

Q. *Do you think you would know the difference between the odor of gasoline and fuel oil?*

A. *Yes, I would. I grew up in a service station.*" (Emphasis added.)

And finally, Mang, the fire investigator for Hoosier, disclosed in his testimony the following:

"A. Well, I found very little contents that would be normal to a normal residence. I didn't find any refrigerator. I only found evidence of one bed.

Q. What evidence did you find of the bed?

A. I found some bedsprings—one set of bedsprings. *I found no evidence of a TV.*

Q. What remains of a TV would you expect to find in a house that had sustained that kind of damage?

A. Well, the casing around the picture tube and the steel mountings of the set itself would be recognizable.

\* \* \* \* \* \*

Q. *Is there any evidence—looking at this picture—of an explosive force within the boiler?*

A. *No, there is not.*

Q. What would you expect to find if there had been an explosive force within the boiler?

A. I would expect to see a bulging of the exterior case as well as the door being out of line or even completely removed from the boiler itself. I would see the burners being disturbed in some way by not being in their normal location.

\* \* \* \* \* \*

A. The fire was incendiary origin—or deliberately set—with a delayed ignition.

Q. You say this was an incendiary fire?

A. That's correct.

Q. And, again, for the Jury, if you would, what does that mean?

A. It means it was deliberately set with human hands or deliberately caused.

Q. Some person set this fire?

A. That's correct.

Q. It was not accidental?

A. No, it was not.

Q. Did you attempt to rule out other acts—or did you attempt to rule out accidental causes for this fire?

A. Yes, I did.

Q. And would you tell us what accidental causes you did rule out.

A. The various electrical appliances that were in the structure. The boiler. The entire conditions of the fire virtually eliminated many elements.

Q. Was there any evidence about the boiler which would indicate that it was involved in the causation of this fire?

A. No, there was not.

Q. Was it to the contrary?

A. Yes.

Q. Was there any evidence about any of the other appliances that you found in the structure that indicated that they were involved in the causation of the fire?

A. No, there was no evidence at all.

Q. Did you check the electrical system?

A. Yes, I did.

Q. Wiring of the house?

A. Yes, I did.

Q. What did you find?

A. That there was evidence of an electrical failure but it was a result of the burning. The fire did not originate around any of the areas.

Q. Did you check the area of the house where the fuse box was?

A. Yes, I did.

Q. What did you find?

A. I found no evidence of an electrical failure in the fuse box itself.

Q. Well, if there had been electrical failure in the fuse box, what would you have found?

A. Well, first of all, I would have found a heat and burn pattern that would be directed in the area of the fuse box if it had been a source; I would have found melting of the copper wiring and holes burnt in the fuse box itself from the electrical arcing.

Q. You found none of these conditions?

A. No, I did not.

Q. So, in your opinion, this fire was set?

A. That's correct." (Emphasis added.)

■ Circumstantial evidence is sufficient to establish proof of arson. *Don Burton, Inc. v. Aetna Life & Casualty Company*, (9th Cir. 1978) 575 F.2d 702; *Gregory's Continental Coiffures & Boutique, Inc. v. St. Paul Fire & Marine Insurance Company*, (7th Cir. 1976) 536 F.2d 1187; *Esquire Restaurant, Inc. v. The Commonwealth Insurance Company of New York*, (7th Cir. 1968) 393 F.2d 111. In *Don Burton, Inc., supra*, the Circuit Court of Appeals faced a fact situation similar to that of the instant case. There, the court stated:

"Unsurprisingly, the notion that a defense of arson can be defeated by a failure to prove that the insured himself was the incendiarist is not supported by any authority to which our attention has been drawn and we have been unable to find any.

\*   \*   \*   \*   \*   \*

*Direct proof of arson is seldom available, so the courts have recognized that it can be established, in proper cases, by circumstantial evidence. Gregory's Continental Coiffures & Boutique v. St. Paul Fire & Marine Insurance Co., 536 F.2d 1187, 1191 (7th Cir. 1976); Harris v. Zu-*

rich Insurance Co., 527 F.2d 528, 530–531 (8th Cir. 1975); *Elgi Holding, Inc. v. Insurance Company of North America,* 511 F.2d 957, 959 (2nd Cir. 1975); *Crown Colony Distributors, Inc. v. United States Fire Insurance Co.,* 510 F.2d 544, 545 (5th Cir. 1975); *Boone v. Royal Indemnity Co.,* 460 F.2d 26, 29 (10th Cir. 1972); *Jamaica Time Petroleum, Inc. v. Federal Insurance Co.,* 366 F.2d 156, 157 (10th Cir. 1966); *People v. Blankenship,* 7 Cal. App.3d 305, 86 Cal.Rptr. 651, 656 (1970); *Pacific Insurance Co. of New York v. Frank,* 452 P.2d 794, 796 (Okl.1969).

\* \* \* \* \* \*

There was circumstantial evidence that the fire here in question was of incendiary origin. The fire was reported in the early hours of a Sunday morning and the firemen responding to the blaze discovered it to be located in the basement of the building, the front and back doors of which were locked. Appellant presented two experts who testified with respect to the origin of the fire. One of them, Larry Heselton, a fire investigator for the Sacramento Fire Department, expressed the opinion that the fire was the result of arson. He ruled out any accidental causes for the fire such as electricity, gas, or spontaneous combustion.

\* \* \* \* \* \*

*We do not mean to imply that the evidence we have outlined was undisputed. What we wish to emphasize is that the evidence presented a triable issue of fact. We are satisfied that a reasonable jury could have concluded that it was more than likely than not that the fire was the result of incendiarism caused or participated in by the insured."* (Emphasis added.)

575 F.2d at 705–8.

In *Esquire Restaurant, Inc., supra,* Circuit Judge Cummings opined:

"*Certainly the introduction into evidence of plaintiff's income tax returns and accountant Roy's testimony were properly admitted to show the poor financial condition of this business prior to the fire, a possible motive for the arson that oc-*curred in October 1961. *Stein v. Girard Insurance Co. of Philadelphia, Pa.,* 259 F.2d 764, 766 (7th Cir. 1958); *McIntosh v. Eagle Fire Company of New York,* 325 F.2d 99, 100 (8th Cir. 1963)." (Emphasis added.)

393 F.2d at 117.

In *Gregory's Continental Coiffures & Boutique, Inc., supra,* the insurance company, having voided the insured's policy, presented evidence at trial that the insured had fraudulently misrepresented the amount of loss in the claim. Following a discussion of the evidence, the court said:

"Arson is often incapable of direct proof, and evidence thereof is often necessarily circumstantial. We agree with the Company that *the circumstantial nature of the evidence was not fatal to its defense herein and did not warrant a directed verdict in favor of the Insured on the defense of arson. See Commerce Union Bank v. Midland National Insurance Co.,* 53 Ill.App.2d 229, 202 N.E.2d 688 (1964)." (Emphasis added.)

536 F.2d at 1191–92.

█ From the foregoing trial testimony, we conclude that Hoosier had reasonable grounds to deny Manginos' claim. Despite the unfavorable verdict for Hoosier on its arson defense, there was *no* evidence of bad faith dealing or evidence from which bad faith dealing could be inferred by reasonable fact finders. In contrast, *Rex* concerned an insurer who could not, in good faith, dispute liability, and therefore, the trial court had probative evidence from which it could reasonably infer oppressive conduct. In the instant case, Hoosier did dispute the issue of liability. Although it did not succeed in convincing the jury, Hoosier had reasonable grounds from which to proceed upon its arson theory as a triable issue of fact.

█ Our reading of *Rex* and *Vernon* leads us to the conclusion that an insurance company is not required to either pay or litigate at its peril. Those cases permit an insurance company, upon pleading a good faith defense, to deny liability without in-

curring the risk of punitive damages, even in instances where its defense fails. In their brief, Manginos concede that the fire may well have been the result of arson. They insist they had nothing to do with it, and they do not know who did. Further, Manginos do not argue that no reasonable grounds existed for Hoosier's defense of arson. More significantly, *no* direct evidence was offered to prove Hoosier's bad faith. As demonstrated by the authorities cited above, had the jury chosen to accept the evidence of arson, it would have been sufficient to support a verdict. In their brief, Manginos summarize eight pieces of evidence which, they argue, "give rise to the inference of oppressive conduct" on the part of Hoosier.

First, Manginos contend Hoosier, through Bursott, refused to provide the necessary claim forms. However, Mr. Mangino testified that Bursott had given him a claim form. Furthermore, Manginos remitted a completed proof of loss claim form to Bursott on January 10, 1977. For this contention, we are not of the opinion that the record indicates:

> "[A] state of mind evidencing bad faith, or where the actor's conduct has a quality that characterizes it as 'reprehensible' as where there is evidence of a consciousness of an *intended* or probable effect calculated *to unlawfully injure* the personal safety or property rights of others." (Citations omitted; emphasis added.)

*Mudgett, supra,* 397 N.E.2d at 1008.

Second, Mr. Mangino testified that Bursott told him: "We don't have to give you nothing" upon giving Mr. Mangino a claim form. Perhaps, Bursott meant that filling out a claim does not necessarily guarantee payment of an insured's loss. Certainly this statement, in and of itself, does not demonstrate malice or oppressive conduct. As we opined in *Mudgett, supra:*

> "[T]here *must* be evidence of 'fraud, malice, gross negligence or oppression' mingled in the controversy.

*Fraud* is defined as:

> 'The *intentional deception, relied upon* by another which induces him to part with property or surrender a legal right...' *Guy v. Schuldt* (1956) 236 Ind. 101, 138 N.E.2d 891.

or as:

> 'A generic term, embracing all multifarious means which human ingenuity can devise, and which are resorted to by one individual to get advantage over another *by false suggestions or by suppression of truth,* and includes all surprise, [trick], cunning, dissembling, and any unfair way by which another is cheated.' Black's Law Dictionary 788 (rev. 4th ed. 1968).

*Malice* is:

> 'The *intentional doing of a wrongful act without just cause* or excuse with an *intent to inflict an injury* or under circumstances that the law will imply *an evil intent.*' Black's Law Dictionary 1109 (rev. 4th ed. 1968).

*Oppression* is defined in *Vernon, supra,* 349 N.E.2d at 184, as:

> 'An act of cruelty, severity, *unlawful exaction,* or *excessive use of authority.*' " (Emphasis added.)

397 N.E.2d at 1006.

Third, Manginos contend that Bursott refused to help them fill out the claim form. Again, testimony discloses that Bursott suggested Manginos use catalogs to estimate the value of possessions which had been destroyed in the fire. Mrs. Mangino testified Bursott had told her to inventory all lost items as best she could and to gather from neighbors statements listing possessions they could remember having seen in the Mangino home. Regardless of these facts, had Bursott not helped Manginos *at all* in filling out their claim, it would not amount to evidence giving rise to an inference of malice or oppressive conduct.

Fourth, Bursott had requested that Manginos sign a nonwaiver agreement [2] before

---

2.   "NON–WAIVER AGREEMENT

IT IS AGREED that any action taken heretofore or hereafter by the insurance company, or companies, signing this agreement in ascertaining the amount of the actual cash value; and the amount of the loss and damage which occurred

proceeding to adjust their claim. Bursott testified that signing this agreement is routine in adjusting insurance claims. Manginos offered no evidence at trial to refute this point, and further, we do not understand how this procedure could amount or did amount to misconduct on Hoosier's behalf. Manginos neither explained at trial nor in their brief, beyond making the assertion, how this conduct gives rise to an inference of oppressive conduct.

Fifth, Manginos argue that Bursott "promised Mrs. Mangino that cost of living expenses would be paid if the Manginos would sign some kind of form." Direct examination of Mrs. Mangino concerning this point revealed the following:

"Q. At anytime following this fire loss, were you advised anything about additional living expenses?

A. Uh-huh.

Q. Who advised you?

A. Mr. Bursott.

Q. Did he discuss that with you at the time you saw him to sign these papers or was that after?

A. I don't know if it was then or after, but he said if we would sign a thirty-day—some kind of thirty-day investigation or something—then they would give us a cost-of-living expenses.

Q. This thirty-day investigation, is that what's set forth in that waiver, to your knowledge?

A. I'm not sure."

As the above testimony indicates, no "form" is properly identified as such nor does it appear anywhere else in the record. Bursott did advise Manginos to keep all receipts for food and lodging, and did explain the additional living expense provision of the insurance policy to Manginos. The above testimony of Mrs. Mangino does not demonstrate any malice or oppressive conduct on the part of Bursott.

Sixth, Mr. Mangino testified that Hoosier and its representatives gave him the "run around." Under cross-examination, he testified:

"Q. All right. There was an occasion when you asked Mr. Bursott for a proof of loss and he refused to give you one—or did not give you one?

A. Like I said, he passed the buck on me on it.

Q. Did he give you one or not?

A. Finally.

Q. That same occasion?

A. I don't remember that sir. I was wasting gas going to see him. He would tell me to call Radcliffe. Radcliffe would tell me to call Hoosier and then Hoosier would tell me to call him and then they'd send me back around the circle again.

Q. Did you fill out any portion of this proof of loss?

A. Yes, I did."

Judging from the vagueness of Mr. Mangino's answers, we cannot ascertain without more evidence what caused his "run around." Furthermore, reasonable persons are *not* able to infer reprehensible conduct on Hoosier's behalf from this testimony.

Seventh, Hoosier, by letter, denied Manginos' claim citing as its reason the following insurance policy provision:

Dec. 22 1976 to Dwelling Property located at R.R. 1, Box 32A Lewis, Ind. Street Address City State and in investigating the cause thereof, shall not waive or invalidate any of the conditions of the policies of insurance.

NOTICE, is hereby given and accepted, and it is hereby mutually understood and agreed, that no representative of any insurance company signing this agreement has power or authority to waive any of the conditions of their respective policies, unless such waiver be specifically made in writing.

THE SOLE OBJECT AND INTENT of this agreement is to provide for the determination of the amount of the actual cash value and the amount of the loss and damage, and an investigation of the cause thereof, without regard to the liability of any said insurance companies."

"This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto."

While the above reason may fall short of what Manginos had expected, we cannot perceive it as evidence of maliciousness without more. By itself, it represents little more than evidence of a good faith dispute concerning the insurance claim.[3] Manginos have not shown any evidence of reprehensible conduct or bad faith on Hoosier's part in denying their claim. We note that following Hoosier's letter of February 24, 1977, denying their claim, Manginos were strangely quiescent and did not contact Hoosier or its representatives to dispute its decision other than to inform Bursott they would be getting in touch with an attorney. We cannot agree with Manginos that Hoosier's letter, in and of itself, is evidence of bad faith dealings tortious in nature. Again, as we stated in *Mudgett, supra*:

> "Courts have long recognized that a *good faith dispute* as to what a contract requires of a party *will never supply the grounds for punitive damages, Jones v. Abriani* (1976) Ind.App., 350 N.E.2d 635; that the legitimate exercise of the 'right to disagree' may directly result in intentional infliction of temporal damage; but that the infliction of such damage is generally regarded as privileged, *Vernon, supra. Courts must be careful not to discourage honest litigation by allowing punitive damages against a party who is merely exercising his right to adjudicate an honest dispute even if he is found to be in error* and even if his litigation in-

jures the other party." (Emphasis added.)

397 N.E.2d at 1008. Surely Manginos do not argue that Hoosier has no legal right to decline a claim; furthermore, Manginos have the right to dispute Hoosier's decision either by way of private resolution or public action through the courts. A mere breach of the insurance policy, or a failure by Hoosier to pay thereunder, standing alone, does not demonstrate oppressive conduct.

Finally Manginos contend that Hoosier acted oppressively in accepting Walkers' (the contract sellers) claim of loss and receiving a quit claim deed to the real estate that Manginos had contracted to purchase from Walkers. Hoosier sent Manginos the following letter[4] on June 7, 1977, informing them of the above transaction and settlement with Walkers:

"June 7, 1977

Chuck and Diana Mangino

R.R. #1, Box 32A

Lewis, IN 47858

Dear Mr. & Mrs. Mangino:

Please be advised that pursuant to Policy No. HO 36838 and a Proof of Loss filed thereon by John M. and Norma H. Walker, payment in the sum of $11,049.80 has been made to them, by a check dated April 27, 1977. As a part of this transaction, the Walkers executed a Quit Claim Deed, conveying all of their rights, title and interest in the real estate in Lewis, Indiana to Hoosier Insurance Company, Inc. *This conveyance was made subject to any rights you may have in said real estate under the Contract Sale of Real Estate between you and the Walkers dated June 1, 1974.*

---

3. At trial, Manginos testified that they did not set fire to their home and did not know its cause or origin. While it is not directly pertinent to our discussion concerning the propriety of the punitive damage award, we note that at the time of its denying liability, Hoosier had reason to believe the fire had been deliberately set. Mr. Gary Mang, a fire investigator with INS Investigations Bureau, Inc., was hired by Hoosier shortly after the blaze to investigate it;

Mang determined that the cause and origin of the fire was incendiary in nature, and was of the opinion that arson was involved. While Mang was investigating the fire, Mr. Mangino told him that he was not employed.

4. We quote the letter in its entirety chiefly because of the significance Manginos attach to it in demonstrating Hoosier's oppressive conduct.

You are hereby notified that future payments due under said Contract are to be made to Hoosier Insurance Company, Inc., P.O. Box 495, Goshen, Indiana 46526. We are in possession of the payment book and upon receipt of each payment from you a photostatic copy of the most recent entry made in said book will be mailed to you for your records.

It has come to our attention that the grass on the subject real estate needs to be cut. Unless you make arrangements for this to be done, we will assume that you have no objection to our doing so. It has also been brought to our attention that there is an open well located on the premises. In view of the immediate hazard created by such condition, we are taking steps to eliminate or reduce this hazard. We are sure that you can appreciate that if someone were to be injured or killed while on these premises, both you and we would be subject to possible liability for damages. In addition, the present condition of the ruins of the house creates a substantial risk of injury or death to anyone who might have occasion to be thereabouts. We are considering either erecting a fence around this area or having it cleared off. *Please advise whether you have any objections to either of these alternatives. Any other suggestions you have will be appreciated.*

> Very truly yours,
> HOOSIER INSURANCE
> COMPANY, INC.
> /s/ Charles J. Hill
> Charles J. Hill
> President
>
> CJH/cw
> cc: John and Norma Walker
> Attorney, N. George Nasser"

(Emphasis added.)

Manginos claim that Hoosier's letter represents a demand to make monthly contract payments to Hoosier, that Manginos were being "dunned" for the contract payments originally negotiated between Walkers and Manginos. After a careful reading of Hoosier's letter of June 7, 1977, we cannot agree with their characterization of it. The letter at most indicates that Hoosier presumed it *had acquired* a legal right to subrogate itself to whatever interest Walkers may have had in the premises. This presumption of Hoosier's was founded upon a mortgage clause provision in its insurance policy agreement with Manginos and Walkers. While we do not intend to explore questions of law and interpretations of factual matters which are presently not before us, Hoosier's letter of June 7, 1977, is *not* evidence which would give rise to an inference of oppressive conduct mingling in the controversy.

In view of all the evidence presented, the jury could not have reasonably concluded that elements of fraud, misrepresentation, malice, gross negligence, or oppression mingled in Hoosier's denial of Manginos' claim or in any other aspect of Hoosier's conduct. The trial court erred in finding Manginos were entitled to punitive damages and that finding was contrary to law. Therefore, we reverse the judgment awarding punitive damages.

Judgment reversed.

ROBERTSON and RATLIFF, JJ., concur.