**Glen BYMASTER and Rosemary Bymaster, Plaintiff-Appellants,**

**v.**

**BANKERS NATIONAL LIFE INSUR-ANCE COMPANY, Pat E. Mattmann and Continental National Corporation, Defendant-Appellees.**

No. 1–884A196.

Court of Appeals of Indiana,
First District.

July 18, 1985.

Rehearing Denied Aug. 21, 1985.

Larry J. Wilson, Martha Grace Reese, Wilson, Hutchens & Reese, Greencastle, for plaintiff-appellants.

David A. Ault, James E. Ayers, Wernle, Ristine & Ayers, Crawfordsville, for Bankers Nat. Life Ins.

NEAL, Judge.

## STATEMENT OF THE CASE

Plaintiffs-appellants, Glen and Rosemary Bymaster (Bymasters), appeal a judgment rendered in the Boone Superior Court after a verdict by a jury in their suit against Bankers National Life Insurance Company (Bankers), Pat E. Mattmann (Mattmann) and Continental National Corporation (CNC) concerning life insurance applications.

We affirm in part and remand with instructions.

## STATEMENT OF THE FACTS

All of the evidence was presented by Bymasters in their case in chief and is undisputed. On July 1, 1977, Bankers entered into a General Agent's Agreement with CNC to sell Bankers' policies. Bankers retained no sales force of its own, but sold life insurance only through general agents. CNC is a marketing rather than an insurance company. By the agreement, Bankers appointed CNC as an agent and independent contractor, but not as an employee. In turn, CNC appointed Mattmann, an officer of CNC, as its agent. Mattmann was not an agent of Bankers at this point. Thereafter, on July 27, 1977, Bankers entered a licensing agreement with CNC as "General Agent" and Mattmann as "agent". CNC then appointed Mattmann as its agent to solicit sales of Bankers' policies. Mattmann was still an employee of CNC rather than of Bankers and was paid by CNC. The General Agency Agreement provided that all money received by CNC for premiums would be held in a premium trust account and be due and payable immediately to Bankers. Bankers also had a right to audit the account. CNC was obligated to deliver 10% of the premiums to Bankers immediately, but could retain 90%. Additionally, CNC's commission was not earned until the policy was delivered.

On February 6, 1979, Mattmann made a sales presentation to the Bymasters for a $100,000.00 life insurance policy upon each

of their lives. While representing to them that he was Bankers' agent, he gave them literature about estate taxes and CNC. Mattmann also showed them what their annual premiums would be and recommended an estate plan after taking their financial histories. The Bymasters filled out and signed insurance applications which reflected that Rosemary had a history of cancer and Glen had a history of heart trouble. The issuance of policies was conditioned upon a number of things including the passing of medical examinations. Glen wrote his check to CNC for $4,279.00, and Rosemary wrote her check to CNC for $4,668.00. These amounts represented the first year premiums. Mattmann then gave each a conditional receipt signed by himself and countersigned by Steven R. Bolson, Bankers' secretary. Mattmann also issued the Bymasters a written guarantee on behalf of CNC for the return of the premiums if the policies were not issued. Pursuant to the agency agreement, 90% of the premiums was retained by CNC and 10% remitted to Bankers.

The Bymasters submitted to medical examinations, but Bankers' underwriters required more information from the Bymasters' physician because of the Bymasters' adverse health histories. When such information was not forthcoming, Bankers notified the Bymasters on May 25, 1979 that their applications had been "incompleted", that is declined, since the conditions had not been met. When the Bymasters had not received the return of their premiums by June 20, 1979, and CNC had not responded to phone inquiries, Rosemary wrote Bankers and demanded the return of their premiums. That letter crossed in the mail with a letter from Bankers containing a check to the Bymasters for $916.10. This amount represented the 10% remitted to Bankers by CNC. The letter instructed them: "If any additional monies are due you, please contact CNC for the balance of any refund. If payment is not received within 10 days of your request to CNC, please contact the Illinois State Insurance Department". Record at 545. Until that time, the Bymasters were unaware of the 90%—10% arrangement.

Meanwhile, Bankers had commenced an audit of the premium trust account in December 1978, which continued into the first quarter of 1979. On March 19, 1979, Bankers terminated the agency agreement with CNC, effective April 18, 1979, because CNC had been slow in responding to inquiries and in making refunds. On May 30, 1979, Bankers made a formal demand of $51,021.00 from CNC as a result of CNC's failure to remit premiums. Thereafter, on June 20, 1979, Bankers made a formal complaint against CNC with the Illinois Department of Insurance. This alleged that CNC had repeatedly misrepresented the terms of certain policies and had repeatedly violated regulations concerning the return of monies held in premium trust accounts.

It is significant that Bankers was unaware for eight months after their mailing of the $916.10 that CNC had not remitted the 90% of the premiums to the Bymasters.

On July 12, 1979, nearly three months after the termination of the agency contract, and after the Bymasters had demanded the return of their premiums, Mattmann again approached the Bymasters. He claimed he did not know why Bankers had refused to accept the applications, but purported that he now was an agent for Equitable Life Insurance Company. In spite of the fact that the Bymasters had intended to demand their premiums back from Mattmann and CNC, they now executed new applications to Equitable upon Mattmann's representations that premiums previously paid would be transferred to Equitable's account. Mattmann then took back the two Bankers' conditional receipts and executed new ones on behalf of Equitable. The Bymasters accepted them. On August 20, 1979, the Bymasters were told by CNC they would have to take additional medical exams for Equitable. They refused and demanded their premiums back.

Bankers learned of this new transaction on February 22, 1980. Because of this intervening transaction with Equitable and CNC, Bankers assumed that the refund

obligation to the Bymasters had been satisfied. Bankers' officer testified that Bankers would have made the refund had not Equitable's transaction intervened. Bankers also does not presently dispute that it owes the Bymasters the premiums. Additionally, CNC is in bankruptcy, and Bankers has over $400,000.00 in unsatisfied claims against it arising out of the agency agreement with CNC.

On November 7, 1980, the Bymasters brought suit against Bankers, Mattmann, CNC and Equitable for actual and punitive damages. Equitable was dismissed from the suit due to the execution of a loan receipt agreement with the Bymasters for $10,000.00. Judgment on jury verdicts was rendered as follows: against Bankers, $28,353.00 for actual damages; against CNC, $200.00 for actual damages and $100,000.00 for punitive damages; against Mattmann, $2,200.00 for actual damages and $50,000.00 for punitive damages. The trial court entered a judgment on the evidence, pursuant to Ind. Rules of Procedure, Trial Rule 50, in favor of Bankers as to punitive damages.

## ISSUES

Bymasters appeal raising the following issues, restated by us:

I. Whether the trial court erred in granting Bankers' T.R. 50 motion for judgment on the evidence as to punitive damages.

II. Whether the trial court erred in making the judgment against Bankers subject to a set-off by reason of the loan receipt agreement with Equitable.

Bankers has perfected a cross-appeal raising one issue:

III. Whether the award of compensatory damages against Bankers was supported by sufficient evidence.

## DISCUSSION AND DECISION

Issue I: *Punitive Damages.*

At the close of Bymasters' evidence, the sole evidence given at trial, the court granted Bankers' T.R. 50 motion for judgment on the evidence concerning punitive dam-

ages. Claiming this ruling as error, the Bymasters' argument proceeds as follows.

CNC and Mattmann were Bankers' agents and were permitted to solicit the sale of policies, collect premiums, and issue conditional receipts on behalf of Bankers. In addition, they were to maintain a premium trust account. The acts of the agents, CNC and Mattmann, were the acts of the principal, Bankers. Further, if CNC and Mattmann were unfit and Bankers was reckless in employing them or retaining them, Bankers would be liable for punitive damages under the authority of *Orkin Exterminating Co. v. Traina,* (1984) Ind. App., 461 N.E.2d 693.

We agree with the Bymasters that the governing rule for granting a T.R. 50 motion was stated in *Ortho Pharmaceutical Corp. v. Chapman,* (1979) 180 Ind.App. 33, 388 N.E.2d 541.

"The rule in Indiana with respect to motions pursuant to T.R. 50, for judgment on the evidence, is that such a motion may properly be granted only if there is no substantial evidence or reasonable inference derived therefrom supporting an essential element of the claim: a complete failure of proof. When considering a motion for judgment on the evidence, the trial court must consider only the evidence and reasonable inferences favorable to the non-moving party. *Huff v. Travelers Indem. Co.,* (1977) [266] Ind. [414], 363 N.E.2d 985; *American Turners of South Bend v. Rodefer,* (1978) [175] Ind.App. [487], 372 N.E.2d 516. The motion must be denied 'where there is *any* evidence or legitimate inference therefrom tending to support at least one of the allegations. Where the evidence is such that the minds of reasonable men *might* differ, a directed verdict is improper, and the resolution of conflictive evidence is for the jury.' (Original emphasis). *Vernon Fire & Casualty Ins. Co. v. Sharp,* (1976) 264 Ind. 599, 349 N.E.2d 173, 179.

*Id.,* 388 N.E.2d at 544.

The Bymasters attempt to demonstrate the following as evidence in support of punitive damages:

1. The Bymasters contend CNC converted the 90% balance of the premiums in the premium trust account to its own use by paying the same to its personnel through commissions. This information was given as an answer to an interrogatory. The record does not show when or to whom it was given.

2. The Bymasters' argument that the terms of their policies were misrepresented is not well taken. There is no evidence that such a misrepresentation occurred. Although there is evidence in the record of misrepresentations in general by Mattmann, none appears concerning the representation of the terms to the Bymasters.

3. The Bymasters assert that Bankers failed to properly audit the premium trust account. The only evidence on this subject showed that Bankers commenced an audit of the trust account in December of 1978. This audit continued into the first quarter of 1979. As a result, Bankers cancelled the agency agreement with CNC on March 19, 1979, effective April 18, 1979. The Bymasters filled out applications and paid their premiums on February 6, 1979. We are not shown how Bankers was derelict in regard to its audit of the account.

4. The Bymasters argue they were owed a fiduciary duty by Bankers, and therefore, fraud can be presumed from the breach thereof. They cite no insurance case as authority. Our supreme court addressed this subject in *Travelers Indemnity Co. v. Armstrong*, (1982) Ind., 442 N.E.2d 349 as follows:

> "[A]lthough there are certain legal and domestic relationships in which the law raises a presumption of trust and confidence on one side and a corresponding influence on the other, such as the relationship of attorney and client, guardian and ward, parent and child, as well as others, *Keys v. McDowell*, (1913) 54 Ind. App. 263, 269, 100 N.E. 385, we are aware of no instance where it has been held or even urged that the relationship between an insuror and the insured entitles the insured, after a dispute has arisen, to rely upon the insuror's interpretation of the contract. This is not to say that the insuror is under no duty to refrain from making fraudulent representations and to act in good faith but only that it is not bound to be correct. Were it otherwise, there simply could be no direct adjustment of claims."

*Id.* at 364.

There is no evidence that Bankers, Mattmann, or CNC misrepresented the policies or any terms of the first transaction. Additionally, no disagreements arose until Bankers rejected the Bymasters' applications on May 25, 1979. The agency agreement had been terminated at this point. The argument then centers around only the return of the premiums. We find *Travelers, supra*, controlling and are unpersuaded that a fiduciary duty existed.

5. The Bymasters argue that Bankers used oppressive conduct in refusing to return the remaining 90% balance of the premiums. The facts show that Bankers entered into an agency agreement with CNC to sell Bankers' policies. CNC is apparently an independent marketing company representing other companies as well as Bankers. This agency was terminated on April 18, 1979. Subsequently, on May 25, 1979, Bankers refused to issue policies to the Bymasters. We interpret these facts as follows. CNC, an independent agency, had failed to obtain policies for the Bymasters with CNC's client, Bankers. Mattmann then approached the Bymasters on July 12, 1979, with an offer to supply policies from another client, Equitable. Mattmann purported that the premiums presumedly under CNC's control would be transferred to Equitable's account. The Bymasters acquiesced, surrendered Bankers' conditional receipts and took Equitable's conditional receipts. Had this second transaction with Equitable been consumated, Bankers would obviously not have been obligated to pay back the remaining balance on the premiums because a novation would have occurred. The second transaction, however, caused Bankers to believe its obligations had terminated. The Bymasters also failed to notify Bankers that the premiums had

not been returned by CNC until February 22, 1980.. By their own conduct, the Bymasters added to Bankers' justifiable confusion. Accordingly, we fail to see any oppressive conduct on the part of Bankers.

6. Contrary to the Bymasters' assertion, the promise to return the advanced premiums if the policies were not written does not constitute fraud on the part of Bankers. Fraud requires an intentional false statement of a past or present fact. *American Independent Management Systems, Inc. v. McDaniel*, (1982) Ind.App., 443 N.E.2d 98. There is no evidence that Bankers, Mattmann or CNC, at the time they received the premiums, had any intention of withholding the premiums if the insurance was not written. It can easily be inferred that CNC's insolvency is a critical factor in not returning the premiums.

In summation, there is no evidence of fraud or other substandard conduct on the part of Mattmann, CNC or Bankers in the solicitation of the insurance, issuance of the conditional receipts, or the processing of the applications up until May 25, 1979. At this point, Bankers refused to write the policies due to the Bymasters' failure to take additional medical exams. The failure to return the money is the only arguable point Bymasters have presented. Furthermore, the activities of Mattmann, CNC and Equitable occurring on July 12 cannot be charged to Bankers because the agency contract had been terminated as of April 18. We are of the opinion that *Travelers, supra,* is controlling.

In *Travelers, supra,* the court adopted a "clear and convincing" standard as the quantum of evidence to sustain punitive damages in a breach of contract action. There, the sole evidence supporting punitive damages for a breach of an insurance contract was a dispute over a refusal by an insurance carrier to pay the amount of the claimed loss. Such conduct, the court held, did not amount to fraud, deceit and oppressive conduct under the clear and convincing standard. The court then stated:

"[P]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other non-iniquitous human failing.... [A] requirement of proof by clear and convincing evidence furthers the public interest when punitive damages are sought."

*Id.* at 362.

The court noted that a claimant has no "right" to punitive damages, but that such damages may be awarded in an appropriate case. The court stated it is better to exonerate a wrong-doer from punitive damages, even though his wrong-doing be gross or wicked, than to award such at the expense of one whose error was one that society can tolerate and who has already compensated the victim for his error. The court adds:

"The propriety of the clear and convincing evidence standard is particularly evident in contract cases, because the breach itself for whatever reason, will almost invariably be regarded by the complaining party as oppressive, if not outright fraudulent. Neither should it be assumed that one who stands to reap the harvest of a punitive damage award will, in all cases, himself be reasonable and forthright. Yet, as acknowledged in *Vernon Fire, etc. v. Sharp, supra,* the social cost of a rule which would make claims nondisputable would result in prohibitive social costs. As stated by Justice Hunter, who authored that opinion, 'Where the facts surrounding the promisor's breach indicates substandard business conduct, the promisee may also enjoy a limited sense of requital in taking his business elsewhere in the future, *but he is not entitled to mulct the promisor in punitive damages.*' 264 Ind. at 608, 349 N.E.2d 173. (Emphasis added).

A rule that would permit an award of punitive damages upon inferences permissibly drawn from evidence of no greater persuasive value than that required to uphold a finding of the breach of contract—which may be nothing more than a refusal to pay the amount demanded and subsequently found to be owing—injects such risks into refusing and defending against questionable claims as to render them, in essence, nondisputable. The public interest cannot be served by any policy that deters resort to the courts for the determination of bona fide commercial disputes. The infliction of this damage has generally been regarded as privileged, and not compensable, for the simple reason that it is worth more to society than it costs, i.e., the insurer is permitted to dispute its liability in good faith because of the prohibitive social costs of a rule which would make claims nondisputable. *Vernon Fire, etc. v. Sharp, supra,* 264 Ind. 609, 610, 349 N.E.2d 173."

*Id.* at 363.

*See also: Hoosier Insurance Co. v. Mangino,* (1981) Ind.App., 419 N.E.2d 978. The circumstances of this case, as analyzed in the six contentions above, convince us that Bankers' conduct does not reflect fraud, deceit, or oppressive conduct by clear and convincing evidence.

The Bymasters argue that Bankers is liable for the acts of its agents, CNC and Mattmann. *Soft Water Utilities, Inc. v. LeFevre,* (1974) 159 Ind.App. 529, 308 N.E.2d 395. Again, we observe that no fraudulent act or misrepresentation is demonstrated to have been perpetrated by CNC or Mattmann in the taking or processing of the applications. The allegations of fraud only relate to CNC's withholding the 90% balance of the premiums and CNC's premature payment of such through commissions which were not to be dispersed until policies were issued. The Bymasters characterized such acts as conversion of the monies from the premium trust account.

We are of the opinion that *Husted v. McCloud,* (1983) Ind., 450 N.E.2d 491, made serious inroads upon the *Soft Water, supra,* holding that an innocent principal is liable in punitive damages for the acts of a fraudulent agent. In *Husted,* a partner in a law firm defrauded the partnership and a client by converting the client's money to his own use. Our supreme court held that the innocent partner was liable for actual but not punitive damages. While discussing the law of agency and IND.CODE 23–4–1–14, which provides liability against partners, the supreme court concluded that where an agent commits an independent fraud for his own benefit, he ceases to act as an agent for his principal. The court held:

"[T]he rationale behind punitive damages in Indiana prohibits awarding such damages against an individual who is personally innocent of any wrongdoing. Punitive damages are not intended to compensate a plaintiff but rather are intended to punish the wrongdoer and thereby deter others from engaging in similar conduct in the future. Accordingly, we now hold that the trial court erred by adjudging the innocent partner in this case responsible for punitive damages."

(Citations omitted).

*Id.* at 495.

As indicated in *Husted,* the rationale for imposing liability upon co-partners for the acts of one partner is grounded in agency. *Lindley v. Seward,* (1937) 103 Ind.App. 600, 8 N.E.2d 119. The application of *Husted* is therefore apparent. CNC's act of conversion by prematurely paying commissions was not advancing Bankers' business. Bankers never condoned this act. In fact, Bankers took action on account thereof. While the Bymasters are entitled to recoup actual damages, under *Husted,* they are not entitled to punitive damages. We limit our holding to the facts of this case.

The court's action in granting the T.R. 50 motion is correct.

Issue II: *Loan Receipt.*

As a part of the judgment, the trial court inserted the following language:

"[Damages are] subject however to any set-off by reason of a loan receipt agreement by and between plaintiffs and against Equitable Life Insurance Company in the sum of $10,000."

Record at 451.

■ The loan receipt agreement involved $10,000.00 advanced by Equitable to be paid back only in the event the Bymasters collected more than a $30,000.00 award. The Bymasters did not raise any question about that entry in their motion to correct errors. However, Bankers addressed this issue in its motion. While ruling on Bankers' motion to correct errors, the court modified the judgment as follows:

"[Damages are] subject, however, to any set-off by reason of a loan receipt agreement in the amount of $10,000, such set-off to be reduced dollar for dollar to the extent plaintiffs receive more than $30,-000 from collection of such judgment for compensatory damages and to the extent plaintiff repays such excess amount to Equitable Life Insurance Company."

Record at 478.

Bankers alleges this issue was waived by the Bymasters' failure to raise it in their motion to correct errors. We are of the opinion that the error is preserved by the trial court's modification of the judgment upon Bankers' motion to correct errors. Ind.Rules of Procedure, Trial Rule 59(B).

■ We are at a loss to understand why the loan receipt was mentioned at all. Since it was, we are at a loss to determine its harm. A loan receipt does not constitute a partial payment of a judgment. *Duke's GMC, Inc. v. Erskine*, (1983) Ind. App., 447 N.E.2d 1118. Should the Bymasters collect more than $30,000.00, they will be obligated on that instrument to return the excess to Equitable up to $10,000.00. The Bymasters may proceed to collect against any of the parties for the full amount of the judgment, but then become liable on the instrument. *Amer. Transport v. Cent. Ind. R.R. Co.*, (1970) 255 Ind. 319, 264 N.E.2d 64.

The trial court is ordered to delete any reference to the loan receipt agreement from the judgment.

Issue III: *Damages.*

The Bymasters treated their separate applications and payments for separate policies of life insurance as one action. They also filed a joint complaint and received a single joint verdict. We view the causes of action as separate. Nevertheless, since both parties are content with this procedure, we shall not disturb it. A joint verdict was rendered in favor of the Bymasters and against Bankers in the amount of $28,353.00. A verdict and judgment for actual damages for $200.00 and punitive damages for $100,000.00 was rendered against CNC. In addition, a verdict and judgment for $2,200.00 actual damages and $50,000.00 punitive damages was assessed against Mattmann. The discrepancy in the amount of judgments between the parties is irreconcilable to us. This is not argued, and only Bankers challenges the amount awarded in the verdict.

The evidence supporting damages against Bankers is as follows: Glen paid premiums of $4,279.00, and Rosemary paid premiums of $4,668.00, both totalling $8,947.00. Bankers reimbursed $916.10, leaving a balance of $8,030.90. In addition to these tangible amounts, the Bymasters claimed the following as compensible losses in their complaint: (1) interest on the premiums; (2) damages for loss of credit; (3) damages for the delay in establishing an estate plan; and (4) damages for severe mental distress and discomfort and the suffering of embarrassment and humiliation. Other than the obvious right to interest, the evidence does not bear out Bymasters' claim for non-tangible damages. In their testimony, Bymasters deny they suffered any loss of credit. They took no medicine and did not attend any physician or psychiatrist. They also suffered no mental stress. There is no evidence of public embarrassment or humiliation, for they told no one. Their strongest statements were that they had several sleepless nights and did not like to be taken.

■ As a general rule, a party injured by a breach of contract is entitled to recover only the loss actually suffered. *Mangino, supra; Stoneburner v. Fletcher,* (1980) Ind.App., 408 N.E.2d 545; *Ogle v. Wright,* (1977) 172 Ind.App. 309, 360 N.E.2d 240. The theory of any damage is compensation for the loss sustained. 9 I.L.E. *Damages,* Sec. 2. Relative to these non-tangible damages, it was said in *Charlie Stuart Oldsmobile, Inc. v. Smith,* (1976) 177 Ind.App. 315, 357 N.E.2d 247:

> "[A]bsent a host action such as physical injury or intentional malicious conduct, mental anguish is so speculative, so subject to exaggeration, so likely to lead to fictitious claims, and often so unforseeable, that there is no rational basis for awarding damages."
>
> (Citations omitted).

*Id.,* 357 N.E.2d at 255.

■ It is well established that a jury's verdict can be set aside only where there is a latent lack of evidence or where it is contrary to the uncontradicted evidence. *Trinity Lutheran Church, Inc. v. Miller,* (1983) Ind.App., 451 N.E.2d 1099; *Sutton v. Roth, Wehrly, Heiny, Inc.,* (1981) Ind. App., 418 N.E.2d 229.

■ Other than the premium balance of $8,030.90, plus interest, we find no justification in letting the judgment stand. Compensatory damages against Bankers must be reduced to $8,030.90, plus interest. The trial court is ordered to correct the judgment accordingly and hear evidence on interest, if necessary.

Judgment affirmed in part, reversed in part, and remanded with instructions.

RATLIFF, P.J., and ROBERTSON, J., concur.