986 F.2d 1424
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Daniel J. HENKIN, Plaintiff-Appellant,
v.
SKANE-GRIPEN A.B. and Bernhard Muskantor, Defendants-Appellees.
 No. 91-3338.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 7, 1992.
Decided Feb. 12, 1993.
 
 Before CUMMINGS, POSNER and FLAUM, Circuit Judges.
 
 ORDER
 
 1
 Daniel J. Henkin filed an amended complaint in May 1988 asserting diversity jurisdiction (28 U.S.C. § 1322(a)), federal question jurisdiction (28 U.S.C. § 1331), and jurisdiction under the Racketeering Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1964(c)). However, the only remaining questions in this case arise through diversity of citizenship. Plaintiff is an Indiana citizen, defendant Skane-Gripen A.B. ("Skane") is a Swedish corporation, and defendant Bernhard Muskantor is a citizen of Sweden.[1]
 
 
 2
 According to the amended complaint, plaintiff was the sole stockholder (or sole stockholder of the parent) of five companies, all headquartered in Elkhart, Indiana, that manufactured and sold musical instruments. Henkin claimed that he was forced to sell these companies for less than they were worth.
 
 
 3
 General Electric Credit Corporation ("GECC") became the prime secured lender of Henkin's companies in November of 1983 by extending to the firms a $35 million line of credit. Henkin began trying to sell the companies in 1984, but he was not successful and in 1985 GECC began pressing him to sell in the immediate future. GECC threatened that if the companies were not sold it would declare a default on its loans and foreclose on its security interests and guarantees. Consequently, in the spring and summer of 1985, Henkin began negotiations with Skane through its agent--defendant Muskantor--for the possible purchase of the five companies. The amended complaint asserted that in the summer of 1985 Skane delivered to Henkin a proposed purchase and sale agreement worth $6 million. In addition, Skane supposedly offered a twelve-year non-competition and consulting contract to Henkin for $50,000 per year. In an August 23 draft, Skane reduced the purchase price to $4.5 million.
 
 
 4
 Henkin alleged that Skane never really intended to pay those amounts. He claims that because of undue pressure from GECC, he was forced to agree on August 27, 1985, to a purchase and sale agreement for the five companies worth just one dollar. Henkin also complained that his consulting and no-compete contract was reduced to two annual installments of $50,000, which were to be followed by ten annual payments of $1,000. GECC is said to have pressured Henkin into selling his companies for this reduced amount by telling him that it would foreclose on $1.5 million in municipal bonds which Henkin had pledged as collateral. Henkin and Skane completed the deal on October 9, 1985, and--to make the humiliation complete--Henkin's consulting and no-compete contract was reduced even further to $1,000 per year for twelve years.
 
 
 5
 However, Henkin's complaint about having to sell his companies for one dollar does not tell the whole story. In addition to the dollar, Henkin received $920,000 in cash, his collateral was released, the companies' obligations to GECC under the loan agreements were forgiven, the firms were indemnified against certain claims and environmental liabilities, and Henkin was given the employment contract. Henkin's compensation actually totalled $3,430,000, an amount that plaintiff himself described as extremely profitable for him (R. Item 120 at 4, p. 4 of attached first memorandum and order, and p. 16 of second attached memorandum and order). Nor is it clear how Henkin could have been forced to accept Skane's supposedly paltry offer with Skane since, by his own admission, he was free to negotiate with other companies until the actual sale in October 1985.
 
 
 6
 On May 30, 1990, District Judge Miller handed down a memorandum opinion and order granting Skane and Muskantor's motion for summary judgment on Henkin's actual fraud claim but denying summary judgment on plaintiff's constructive fraud claim. The other issues were decided against Henkin. That memorandum and order are attached to this Court's order.
 
 
 7
 On August 7, 1991, Judge Miller released another memorandum opinion and order disposing of Henkin's constructive fraud claim[2] and refusing to reconsider the earlier order granting the Swedish defendants summary judgment on the issue of actual fraud. That memorandum and order is also attached. Final judgment in their favor on all issues was entered on September 3, 1991. This appeal concerns only the actual and constructive fraud issues.
 
 
 8
 Since we fully agree with Judge Miller's reasoning, there is no need to elaborate upon his attached memoranda and orders. We affirm the summary judgment in Skane's and Muskantor's favor.
 
 
 9
 ATTACHMENT
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION
Daniel J. Henkin, Plaintiff
vs.
General Electric Credit Corp., et al., Defendants
Cause No. S87-598.
(May 30, 1990).
 
 MEMORANDUM AND ORDER
 
 10
 This cause comes before the court on a motion for summary judgment filed by defendants Bernhard Muskantor and Skane-Gripen AB ("Skane-Gripen"). On February 2, 1990, the court granted summary judgment in favor of defendant General Electric Credit Corporation ("GECC").[1] For the reasons that follow, the court finds that the remaining defendants' motion should be granted in part and denied in part.
 
 
 11
 This case arises out of allegations by plaintiff Daniel J. Henkin that defendants Skane-Gripen and Bernhard Muskantor forced him to sell his companies for less than they were worth. Mr. Henkin alleges that the defendants initially offered an inflated price for his companies which they never intended to pay, doing so to eliminate other potential buyers. Mr. Henkin also alleges that the defendants conspired with GECC to force Mr. Henkin to sell only to Skane-Gripen. Then, when Skane-Gripen knew that Mr. Henkin had no alternatives, the defendants took advantage of financial pressure being applied by GECC and arbitrarily reduced the price they were willing to pay for the companies. Mr. Henkin seeks compensatory and punitive damages for the economic injury he allegedly suffered.
 
 The Complaint
 
 12
 Mr. Henkin's amended complaint contains numerous claims against the defendants. Claim Four alleges that GECC and Skane-Gripen conspired to cut out potential alternative purchasers of the Henkin companies. Claim Six alleges that Skane-Gripen and Mr. Muskantor breached an implied covenant of good faith and fair dealing. Claim Seven alleges that the defendants knowingly and intentionally misrepresented their true intentions when they provided Mr. Henkin with the initial Purchase Agreement and Consulting and Non-Competition Agreement. Claims Eight, Nine, and Ten allege that the defendants conduct violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1661 et seq. Claims Eleven and Twelve allege that Mr. Henkin is entitled to punitive damages due to the defendants acting in a malicious and fraudulent manner and contrary to public policy. Claim Thirteen alleges that Skane-Gripen converted Mr. Henkin's personal property. The court will address each of these claims separately.
 
 Factual Background
 
 13
 Mr. Henkin's companies were all involved in the manufacture and sale of musical instruments. The operation of these companies was financed in November of 1983 through a $35 million line of credit with GECC. As a condition precedent to obtaining the credit line, Mr. Henkin pledged his municipal bond portfolio worth at least $1.5 million to GECC. Mr. Henkin's companies defaulted on their obligations to GECC under the loan agreements.
 
 
 14
 In 1984, Mr. Henkin began trying to sell his companies to a number of potential buyers and attempting to raise capital for his companies through several brokerage houses. In 1985, Bernhard Muskantor began negotiations on behalf of Skane-Gripen for the purchase of the Henkin companies. Mr. Henkin states that at their first meeting he advised Mr. Muskantor of pressure that GECC, the main secured lender of Henkin's companies, was putting on him and that he was being forced to sell his companies as a result of this pressure. Mr. Muskantor states that Mr. Henkin initially advised him that he was selling his companies for health reasons. As negotiations progressed with Bernhard Muskantor, Mr. Henkin continued to negotiate with other potential buyers. Two attorneys and a financial consultant represented Mr. Henkin throughout the negotiations with Skane-Gripen.
 
 
 15
 During the course of the negotiations and Skane-Gripen's investigation of the companies, several material items were discovered which reduced the price Skane-Gripen was willing to pay for the companies. Mr. Henkin contends that Skane-Gripen was aware of these items before the final draft of the purchase and sale agreement was prepared. As evidence of Skane-Gripen's intention to isolate Mr. Henkin from other potential purchasers, Mr. Henkin submitted a copy of a draft of the purchase and sale agreement dated August 23, 1985. This draft contains a sale price of $4.5 million. Mr. Henkin contends that four days later as a result of financial pressure from GECC (and not, he maintains, as the result of material facts justifying a reduction in the purchase price), the defendants arbitrarily reduced the price they were willing to pay to a "mere one dollar" as evidenced by the August 27, 1985 final draft of the purchase and sale agreement.
 
 
 16
 Skane-Gripen vehemently objects to the authenticity of the August 23, 1985 draft of the purchase and sale agreement. The defendants contend that the only evidence before the court is that material facts continued to be disclosed up to the final closing on October 9, 1985,[2] that Mr. Henkin continued to negotiate with other potential buyers up to the final closing, and that the final negotiated purchase price of $920,000.00 cash, release of his collateral, payment of the Henkin companies' obligations to GECC under the loan agreements, indemnification against certain claims, assumption of EPA liabilities, an employment contract, and medical insurance was well in excess of $1.00. Part of the final agreement provided that:
 
 
 17
 ... seller hereby acknowledges and agrees that the purchase price and other consideration for seller's shares to be sold to buyer hereunder were arrived at through arm's-length negotiations without coercion of any kind, and represents fair, reasonable and adequate consideration for seller's interests in the companies.
 
 Summary Judgment Standard
 
 18
 In the February 2, 1990 order granting GECC summary judgment, the court set forth the principles governing summary judgment:
 
 
 19
 A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); Indiana Grocery, Inc. v. Super Valu Stores, Inc., 864 F.2d 1409, 1412 (7th Cir.1989). If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Zayre Corp. v. S.M. & R. Co., Inc., 882 F.2d 1145 (7th Cir.1989); Herman v. Chicago, 870 F.2d 400, 404 (7th Cir.1989). If he fails to do so, summary judgment is proper. United States v. Selenske, 882 F.2d 220, 221 (7th Cir.1989). A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. Gomez v. Chody, 867 F.2d 395 (7th Cir.1989). Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Schroeder v. Copley Newspaper, 879 F.2d 266, 269 (7th Cir.1989); Wolf v. Fitchburg, 870 F.2d 1327, 1330 (7th Cir.1989).
 
 
 20
 The court must draw any permissible inferences from the materials before it in favor of the non-moving party, Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Vachet v. Central Newspapers, Inc., 816 F.2d 313 (7th Cir.1987), as long as the inferences are reasonable. Spring v. Sheboygan Area School District, 865 F.2d 883, 886 (7th Cir.1989); Davis v. Chicago, 841 F.2d 186 (7th Cir.1988). The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law. Local 1545, United Mine Workers v. Inland Steel Coal Co., 876 F.2d 1288, 1293 (7th Cir.1989); Wainwright Bank & Trust Co. v. Railroadmen's Federal Sav. & Loan Ass'n, 806 F.2d 146 (7th Cir.1986).
 
 
 21
 Even on an issue of intent, summary judgment is proper if the party with the burden at trial presents no indication of the necessary motive or intent. Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307 (7th Cir.1989); Corrugated Paper Products, Inc. v. Longview Fibre Co., 868 F.2d 908, 914 (7th Cir.1989).
 
 
 22
 Those principles remain unchanged for purposes of the summary judgment motion now before the court.
 
 Actual Fraud
 
 23
 The defendants contend that Mr. Henkin's fraud claim fails as a matter of law because he has failed to plead fraud with sufficient particularity and because he not come forth with facts sufficient to make out a prima facie case of fraud.
 
 
 24
 Fed.R.Civ.P. 9(b) requires fraud to be pleaded with particularity. The defendants maintain that the complaint fails to specify the time, place, and content of the alleged misrepresentation. Mr. Henkin counters that he has alleged an overall scheme which constitutes fraud. As part of the scheme, Mr. Henkin claims that Mr. Muskantor misrepresented his initial intention to pay $6 million for the companies, and that he also misrepresented his later intention of August 23, 1985 to pay $4.95 million for the companies.
 
 
 25
 A review of the amended complaint indicates that Mr. Henkin has adequately specified the time, place, and content of the alleged misrepresentation. The complaint alleges that Skane-Gripen drafted and delivered to Mr. Henkin a proposed purchase and sale agreement wherein Skane-Gripen would pay $6 million for the Henkin Companies. (Amended Complaint, p 23). While recognizing that the defendants dispute the truth of this allegation, it is apparent that Mr. Henkin has pleaded something slightly more than what is needed beyond the short, plain statement of the claim normally sufficient under Fed.R.Civ.P. 8. Design Time v. Synthetic Diamond Technology, 674 F.Supp. 1564, 1568 (N.D.Ind.1987).
 
 
 26
 The defendants also claim that Mr. Henkin's allegation that Skane-Gripen and Bernhard Muskantor misrepresented their true intentions during negotiations for the purchase of Mr. Henkin's companies fails, as a matter of law, to state a claim. Actionable fraud, the defendants argue, cannot be predicated on a promise to do a thing in the future, even if there is no intention of fulfilling the promise. Sachs v. Blewett, 206 Ind. 151, 156, 185 N.E. 856 (1933). The defendants further argue that Mr. Henkin has failed to show reliance upon the representations in light of the fact that he continued to negotiate with other prospective purchasers right up until the final closing.
 
 
 27
 Mr. Henkin argues that Bernhard Muskantor's representations during negotiations that Skane-Gripen was willing to pay $4.95 million was a misrepresentation of his current intentions, citing Indiana & Michigan Electric Co. v. Harlan, 504 N.E.2d 301 (Ind.App.1987). Mr. Henkin also argues that the defendants' timing in first offering a much higher price and then lowering the price resulted in his isolation from other prospective buyers and his failure to continue serious negotiations with any other purchasers. Thus, Mr. Henkin claims he had no other alternative than to go through with the deal with the defendants.
 
 
 28
 The essential elements of actual fraud are the material misrepresentation of past or existing facts, which representation is false, made with knowledge or reckless ignorance of its falsity, which causes reliance to the detriment of the person relying upon it. Vaugh v. General Foods Corporation, 797 F.2d 1403, 1410 (7th Cir.1986), cert. denied 479 U.S. 1087 (1987); First National Bank of New Castle v. Acra, 462 N.E.2d 1345 (Ind.App.1984). Fraud cannot be predicated on unfulfilled promises or statements concerning future events. Captain & Co. v. Stenberg, 505 N.E.2d 88 (Ind.App.1987); Kopis v. Savage, 498 N.E.2d 1266 (Ind.App.1986). To establish fraud there must be an intentional false statement of a past or present fact. Bymaster v. Bankers Nat'l Life Ins. Co., 480 N.E.2d 273 (Ind.App.1985). The plaintiff must also show reliance on the representations made by the defendant. Plymale v. Upright, 419 N.E.2d 756 (Ind.App.1981).
 
 
 29
 In Indiana & Michigan Electric Co. v. Harlan, 504 N.E.2d 301 (Ind.App.1987), a case cited by Mr. Henkin, the plaintiff sold a parcel of real estate to Indiana & Michigan Electric Company ("I & M") and Indiana Franklin Realty, Inc. ("IFR"), a holding company used to acquire property not presently needed for utility purposes, but which may be needed for utility purposes in the future. The trial court held that representations of I & M and IFR's agent of a present need for the land and a threat to use eminent domain to acquire the plaintiff's property were patently false and fraudulent. In reality, I & M had no plans to use the land for any public purpose. I & M and IFR appealed the trial judge's ruling arguing among other things that the court erred in finding that fraud can be predicated upon statements of future intentions or upon the opinion of I & M and IFR's agent. The court of appeals held that I & M and IFR's misrepresentations were misrepresentations of present facts and not statements of future intentions. The status of the defendants' plans which were known only to I & M and IFR was also a fact, not an opinion. Indiana & Michigan Electric Co. v. Harlan, 505 N.E.2d at 306.
 
 
 30
 Indiana & Michigan Electric is distinguishable from the case at bar, which is more akin to the case of Sachs v. Blewett, 206 Ind. 151, 185 N.E. 856 (1933), a case cited by Skane-Gripen and Bernhard Muskantor. In Sachs, the defendants outbid bona fide bidders for property the plaintiff was auctioning. After the auction, the defendants told the plaintiff that they would only pay $10,750.00 for the property rather than the $12,250.00 they had bid. Due to the Statute of Frauds, the buyers had no legal obligation to carry out their agreement. The court held that "actionable fraud cannot be predicated upon a promise to do a thing in the future, although there may be no intention of fulfilling the promise." Sachs, 185 N.E. at 858. The court further stated: "Fraud cannot be predicated upon acts which the party charged has a right by law to do nor upon the non-performance of acts which by law he is not bound to do, whatever may be his motive, design or purpose, either in doing or not doing the acts complained of." Sachs, 206 Ind. at 156, 185 N.E. at 859.
 
 
 31
 After drawing all reasonable inferences in Mr. Henkin's favor for summary judgment purposes, it becomes clear that he has failed to state a claim for actual fraud. Assuming that the defendants lied when they offered $6 million for the companies in an effort to isolate Mr. Henkin from any other serious buyers, and assuming further that they lied again when they offered $4.95 million for companies for which they intended to pay only $1.00, these were promissory misrepresentations of future performance that will not support an action for actual fraud. Sachs v. Blewett, 206 Ind. 151, 185 N.E. 856 (1933); Eby v. York-Division, Borg-Warner, 455 N.E.2d 623 (Ind.App.1983); Captain & Co., Inc. v. Stenberg, 505 N.E.2d 88, 96 (Ind.App.1987). Accordingly, the defendants are entitled to summary judgment on the actual fraud claims.
 
 Constructive Fraud
 
 32
 Promissory misrepresentations can, however, support an action for constructive fraud under Indiana law. Blaising v. Mills, 176 Ind.App. 141, 374 N.E.2d 1166 (1978). "Constructive fraud consists of most of the same elements as actual fraud; material representation of past or existing facts (constructive fraud includes promissory facts, too), which representations are false and cause a reliance upon such representation to the detriment of the one so relying." Eby v. York Division, Borg-Warner, 455 N.E.2d 623, 628, citing Blaising v. Mills, 176 Ind.App. 141, 374 N.E.2d 1166 (1978). Constructive fraud provides a remedy by refusing to sanction behavior that procures an unconscionable advantage to one party over another regardless of the intent. Id., citing Brown v. Brown, 235 Ind. 563, 135 N.E.2d 614 (1956); Lawshe v. Glen Park Lumber Co., 176 Ind.App. 344, 375 N.E.2d 275 (1978).
 
 
 33
 Mr. Henkin has met his burden under Fed.R.Civ.P. 56 by coming forward and showing the existence of disputed facts regarding the defendants' representations and Mr. Henkin's reliance upon those representations. There being genuine issues of material fact concerning the claim for constructive fraud, summary judgment is inappropriate on that claim.
 
 
 34
 Implied Duty of Good Faith and Fair Dealing
 
 
 35
 Mr. Henkin has alleged that Skane-Gripen and Bernhard Muskantor breached their implied covenant of good faith and fair dealing in their dealings with Mr. Henkin. The defendants argue that the duty of good faith and fair dealing goes only to the performance and enforcement of a contract and not the negotiations, citing Restatement (Second) of Contracts § 205 comment c (1981).[3]
 
 
 36
 None of the cases cited by Mr. Henkin in support of this claim deal with a factual situation involving fraudulent activity during negotiations leading to a contract. Prudential Ins. Co. of America v. Crouch, 606 F.Supp. 464 (S.D.Ind.1985), aff'd 796 F.2d 477 (7th Cir.1986), concerned an alleged breach of a covenant not to compete and misappropriation of confidential information. American Fletcher Mortgage Co. v. U.S. Steel Credit Corp., 635 F.2d 1247 (7th Cir.1980), cert. denied 451 U.S. 911 (1981), dealt with the duty of parties engaged in a common enterprise to act in good faith toward their co-venturers. Craft v. Economy Fire & Cas. Co., 572 F.2d 565, 567 (7th Cir.1978), dealt with an implied covenant in automobile insurance policies that the insurance company would handle claims under the uninsured motorist coverage of the policies fairly and in good faith. The other cases cited by Mr. Henkin all deal with Indiana's recognition of an implied duty of good faith and fair dealing with regard to other types of insurance coverage. Vernon Fire & Casualty Ins. Co. v. Sharp, 264 Ind. 599, 349 N.E.2d 173 (1976) (fire insurance); Rex Insurance Co. v. Baldwin, 163 Ind.App. 308, 323 N.E.2d 270 (1975) (life insurance).
 
 
 37
 Mr. Henkin's allegations that Skane-Gripen and Bernhard Muskantor breached an implied duty of good faith and fair dealing all concern the negotiation process and not performance or enforcement of the contract. Accordingly, under Indiana law, the defendants are entitled to summary judgment on this claim.
 
 RICO Claims
 
 38
 The defendants argue that Mr. Henkin's amended complaint alleges a single transaction, involving a single alleged victim, occurring over a very short period of time, thus failing to satisfy even a most liberal reading of the RICO statute. The existence of a pattern of racketeering is a crucial element of a claim under 18 U.S.C. § 1962. Elliott v. Chicago Motor Club Insurance, 809 F.2d 347, 349 (7th Cir.1986). The defendants argue that the Seventh Circuit has rather consistently held that a pattern of racketeering activity is not shown when multiple predicate acts all relate to one transaction involving a single victim and a single injury. See SK Hand Tool Corp. v. Dresser Industries, Inc., 852 F.2d 936 (7th Cir.1988), cert. denied 109 S.Ct. 3241 (1989) (seller's misrepresentation of a company's true financial condition not a pattern despite multiple mailings and wire communications); Skycom Corp. v. Telstar Corp., 813 F.2d 810 (7th Cir.1987) (no pattern where alleged fraudulent representations led up to a single contract and the transfer of a single business opportunity); Lipin Enterprises, Inc. v. Lee, 803 F.2d 322 (7th Cir.1986) (allegations of fraudulent sale of a company and its wholly-owned subsidiary to a single buyer involving twelve mailings did not constitute a pattern).
 
 
 39
 Mr. Henkin has made no response to the defendants' arguments regarding the insufficiency of his RICO allegations. His RICO claims fail to allege a pattern of racketeering activity and, accordingly, the defendants are entitled to summary judgment on those claims.
 
 Conversion
 
 40
 Mr. Henkin's thirteenth claim alleges that Skane-Gripen converted his personal property when it took possession of a building and real estate that had previously been the location of Marden, one of the Henkin companies. The affidavit of Bernhard Muskantor indicates that Skane-Gripen did not take possession of any building or real estate owned by Mr. Henkin and did not convert any leasehold improvements or other personal property owned by Mr. Henkin.
 
 
 41
 Mr. Henkin has not responded to this portion of the defendants' motion and has admitted that it is "probably correct" that United Musical Instruments U.S.A., Inc. took possession of the items which Mr. Henkin claims to have been converted. (Henkin Dep., at 609). Accordingly, the defendants are entitled to summary judgment on this issue.
 
 Prima Facie Tort
 
 42
 Mr. Henkin urges the court to acknowledge the validity of a cause of action for a "prima facie tort". While such a cause of action has been recently recognized by the New Mexico Supreme Court in Schmitz v. Smentowski, 109 N.M. 386, 785 P.2d 726 (1990), this theory has never been recognized by any Indiana court, and this court is loathe to recognize a new theory of tort without some guidance from the Indiana courts. Resident litigants who seek adventurous departures in state common law have been advised to sue in state rather than federal court, as federal court is not the place to press innovative theories of state law. Anderson v. Marathon Petroleum Co., 801 F.2d 936, 942 (7th Cir.1986).
 
 
 43
 Nor is there any evidence before the court of illegal activity that would support a claim for tortious interference with a business relationship, although such a cause of action has been recognized as existing under Indiana law. Biggs v. Marsh, 446 N.E.2d 977, 983 (Ind.App.1983). As the Biggs court stated, it is critical to maintaining such an action that the defendant acted illegally in achieving his end. The defendants are entitled to judgment on these issues.
 
 Punitive Damages
 
 44
 It is well settled that punitive damages may be awarded if the plaintiff establishes by clear and convincing evidence that the defendant acted fraudulently. Bud Wolf Chevrolet, Inc. v. Robertson, 519 N.E.2d 135 (Ind.1988). Based on the record before the court, summary judgment would be inappropriate on this issue at this time.
 
 Conclusion
 
 45
 For all the forgoing reasons, the defendants' motion for summary judgment is hereby GRANTED IN PART and DENIED IN PART. There being no genuine issue of material fact, and because Skane-Gripen and Bernhard Muskantor are each entitled to judgment as a matter of law, the defendants' motion is GRANTED with respect to the claims for actual fraud, breach of an implied covenant of good faith and fair dealing, conversion, prima facie tort, tortious interference with a business relationship, and the RICO claims. The plaintiff having met his burden under Fed.R.Civ.P. 56 by coming forward and showing the existence of disputed facts, the defendants' motion is DENIED with respect to the claims for constructive fraud and punitive damages.
 
 
 46
 SO ORDERED.
 
 
 47
 /s/ Robert L. Miller, Jr.
 
 Robert L. Miller, Jr., Judge
 United States District Court
 
 48
 cc: May/Johnson
 
 Weil/Freiburg
 Ham/Powers/Moreland
 Woods
 Kirby/Burton
 DeBaun
 Order Book
 
 49
 UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION
Daniel J. Henkin, Plaintiff
v.
Skane-Gripen AB, et al., Defendants
Cause No. S87-598 (RLM).
(Aug. 7, 1991).
 
 MEMORANDUM AND ORDER
 
 50
 This cause is before the court on the motion for summary judgment filed by defendants Bernhard Muskantor and Skane-Gripen AB ("Skane"). Following this court's May 30, 1990 order, the only claim remaining against these defendants is a claim of constructive fraud. Familiarity with the previous orders in this action is assumed.
 
 
 51
 Mr. Henkin alleges that the defendants took unfair advantage of his dire financial situation when negotiating to purchase his companies by offering an inflated price they never intended to pay, thereby discouraging him from seeking other buyers at a time that he desperately needed to sell.
 
 
 52
 When the court entered partial summary judgment in the defendants' favor in May, 1990, it denied summary judgment on the constructive fraud count because Mr. Henkin had demonstrated the existence of disputed facts regarding the defendants' representations and his reliance. The defendants now assert that later discovery shows their entitlement to summary judgment on the constructive fraud claim: they made no "promissory representations" that would support a claim for constructive fraud; they did not procure an unconscionable advantage over Mr. Henkin; Mr. Henkin did not justifiably rely on any of their representations; and no fiduciary or other special relationship existed between the parties.
 
 Facts
 
 53
 While seeking a buyer for his companies, Mr. Henkin had the advice of experienced and capable professionals, attorneys William Thorne and John Carey and certified public accountant Joseph Sharp. According to Mr. Thorne's deposition testimony, Mr. Henkin played a dominant role in the negotiations and had strong opinions as to his companies' worth and the sale agreement's terms.
 
 
 54
 Mr. Henkin began seeking a buyer in August, 1984, a year before executing his final contract with the defendants, and negotiated with a total of seven prospective purchasers. In April, 1985, he signed letters of intent with two prospective purchasers, Roy Greenberg and Bentley Blum. Mr. Sharp testified that it is not normal to negotiate with other prospective purchasers after signing a letter of intent with one.
 
 
 55
 According to the defendants, in January, 1985, Mr. Henkin contacted Mr. Muskantor and asked him to buy his business or become his partner. Because of Mr. Muskantor's commitment with Skane, he refused. Mr. Henkin states in his brief that Mr. Muskantor first contacted him, but the deposition testimony upon which he relies does not state who initiated the parties' discussions. Because the existence of constructive fraud does not depend upon resolution of this issue, the court need make no determination on this matter. In February, 1985, Mr. Muskantor visited Mr. Henkin and briefly discussed with him the sale of the companies. Mr. Henkin claims that Mr. Muskantor mentioned a price of $6 million, with an additional $1 million kick-back for Mr. Muskantor. Mr. Henkin further claims that he refused to get involved with a kick-back, that Mr. Muskantor then offered $6 million for the companies, and that with this attractive offer Mr. Henkin did not pursue negotiations with others who expressed interest in the companies. The defendants claim that Mr. Henkin mentioned this amount, and Mr. Muskantor did not know enough about the companies to know whether they were worth that price.
 
 
 56
 Mr. Henkin's brief states that at this meeting Mr. Muskantor was given the most recent financial statements, up to date sales figures, and a status report of the loans from General Electric Credit Corporation ("GECC"). The deposition testimony upon which he relies is less certain; Mr. Henkin stated in his deposition:
 
 
 57
 Q. Did Mr. Muskantor look at any books or records at this meeting?
 
 
 58
 A. I believe that he--at the initial meeting that the only--that he got a copy of our--of our audited statements.
 
 
 59
 Q. Is that the extent of his investigation at that time?
 
 
 60
 A. I don't--I don't recall. We had so many meetings, and I just don't recall what--what the extent was of his investigation of the financial status of the company.... But he got--I believe that I gave him our--I believe I gave him quite a bit of materials at that time that we had available.
 
 
 61
 Q. Do you remember what besides the financial statements?
 
 
 62
 A. I believe--it seems to me that he got sales figures broken down.
 
 
 63
 * * *
 
 
 64
 * * *
 
 
 65
 A. I believe I gave him our status report with GECC. I believe he got a copy of that.... I believe he got a copy of all of the factories and plants that we had, stating--each one stated the appraised value of the plants, the--whether they were--whether the plant was owned or leased, and most of them were owned, what the square footage was of each plant, what each plant produced. I believe he got a copy of that.
 
 
 66
 Q. Did Mr. Muskantor do an independent investigation or audit of your books at that time?
 
 
 67
 A. At our very first meeting?
 
 
 68
 Q. Yes.
 
 
 69
 A. I don't recall that he personally went in and checked the books.
 
 
 70
 Henkin deposition, pp. 300-301.
 
 
 71
 Mr. Henkin also states that at the first meeting he told Mr. Muskantor of the financial pressure GECC exerted on him and that he was being forced to sell his companies.
 
 
 72
 Mr. Muskantor testified that during their negotiations, Mr. Henkin said he was very wealthy and that the companies represented only a small portion of his holdings. Mr. Henkin's extravagant entertainment of Mr. Muskantor and Mr. Stenquist, also of Skane-Gripen, on the company tour did not paint a picture of a person with financial trouble. Mr. Henkin told Mr. Muskantor that although he loved music and the companies were doing well, he was interested in selling his companies only because his health was failing. For this reason, Mr. Muskantor says he was unaware that Mr. Henkin was under pressure from GECC.
 
 
 73
 In April, Mr. Henkin hosted Mr. Muskantor and Mr. Stenquist at a tour of Mr. Henkin's companies in the United States and Mexico. Thereafter, Mr. Muskantor presented a report on the Henkin companies to Skane's board, and Skane's attorney drafted a letter of intent. The letter of intent was not executed because Mr. Henkin informed Mr. Muskantor that another prospective purchaser had submitted a letter of intent to purchase the companies for $5 million, a price Skane could not match.
 
 
 74
 In the summer, Mr. Henkin renewed his negotiations with Skane, and Skane hired an attorney to begin a negotiating process, but, to allow Mr. Henkin the freedom to negotiate with others, no letter of intent was executed. The defendants were involved in serious negotiations with Mr. Henkin for approximately a month, during which time Mr. Henkin negotiated with other prospective purchasers.
 
 
 75
 Mr. Muskantor claims that he received a draft of an agreement from Mr. Henkin containing a purchase price of $6 million. Mr. Muskantor considered this amount unreasonable and instructed Skane's attorney, Richard Weil, to draft an agreement with the purchase price blank. In July, Mr. Muskantor learned of a $10 million decrease in the Henkin companies' net operating losses and tax credits. Mr. Muskantor also questioned a footnote in a financial statement that indicated a $500,000.00 environmental clean-up cost. Mr. Henkin said the cost was considerably less and that the previous owner would be responsible for the cost. However, the previous owner had been adjudged not responsible. These problems led Mr. Muskantor to tell Mr. Henkin on July 22 that he was unprepared to discuss price until he talked with Skane's president, Sten Johnson. At a meeting in Mr. Henkin's home on July 26, Mr. Henkin, Mr. Johnson, and Mr. Muskantor decided on a tentative price of $3.25 million, plus repayment of Mr. Henkin's promissory notes in the amount of $932,000.00 and accrued interest, less some reimbursements to the companies. This price was subject to confirmation of the accuracy of the information Mr. Henkin provided.
 
 
 76
 Skane's investigation revealed the companies' unhealthy financial condition. An artificial profit was created by an inter-company transaction. Several million dollars worth of "sales" on the books were actually consignments. For the most part, the companies were not operating at a profit. Receivables, inventories, and pension plans were under-reserved. Environmental consultants estimated that the clean-up costs would be up to $3 million.
 
 
 77
 According to the defendants, these disturbing discoveries, most of which were made between August 16 and August 23, 1985, drastically reduced the price Skane was willing to pay for the Henkin companies. (Weil deposition, pp. 87-97). Sometime between August 21 and August 23, Mr. Muskantor obtained authority to offer Mr. Henkin $500,000.00 plus repayment of Mr. Henkin's promissory notes, contingent upon the fulfillment of certain warranties. Mr. Henkin telephoned Mr. Muskantor a day or two after the offer was made, saying he was ready to accept it, but wanted to discuss it further.
 
 
 78
 On August 27, 1985, the parties executed a final agreement with a purchase price of $1.00, plus repayment of $932,000.00 plus interest. This final agreement would provide Mr. Henkin more cash and less liability than the $500,000.00 proposal, because under the $500,000.00 proposal, the $932,000.00 amount could have been used against reserves until December 31, 1986. In a letter drafted the next month, Mr. Thorne called the contract very reasonable and stated that the only reason for Mr. Henkin's willingness to close the transaction was Mr. Muskantor's willingness to limit Mr. Henkin's liability for breach of certain warranties.
 
 
 79
 According to Mr. Henkin, and as set forth in Mr. Sharp's affidavit, Mr. Muskantor and Skane were representing to Mr. Henkin as late as August 23, 1985 that Skane was willing to pay millions of dollars for the Henkin companies. Mr. Henkin produced a draft of a purchase agreement dated August 23, 1985, which provided for payment of $4,950,000.00, plus stock options for 500,000 shares of Stam A Fria and 1,500,000 shares of Stam B Fria Skane stock. Further, Mr. Sharp's affidavit states that Skane made this offer after conducting its due diligent investigation, and no further facts came to light between August 23 and August 27 that would change the Henkin companies' value.
 
 
 80
 Richard Weil and James Freiburg, Skane's attorneys during negotiations, first testified that they doubted the genuineness of the $4.95 million draft. However, Mr. Henkin's attorneys found a copy of this draft in Mr. Weil's files with handwritten corrections on it. Upon review of their files, Mr. Weil and Mr. Freiburg determined that they did prepare the $4.95 million draft, but they maintain that this draft does not represent the status of the parties' negotiations as of August 23.
 
 
 81
 During the final negotiations with Skane, Mr. Henkin had an offer from Bentley Blum, but Mr. Henkin's advisors recommended that he contract with Skane instead. According to Mr. Sharp, Skane was "a bird in the hand.... There was a definitive contract ready to be signed and we signed it." At that time, Mr. Henkin's advisors were uncertain whether by accepting an offer from Bentley Blum they could accomplish their goal of recovering the bonds that Mr. Henkin had pledged as collateral for his loan from GECC. Therefore, although Bentley Blum would have paid a high price for Mr. Henkin's companies, Mr. Henkin and his advisors believed that selling to Skane would be more secure.
 
 
 82
 It was only after Mr. Henkin had concluded a contract with Skane-Gripen that Mr. Thorne informed Bentley Blum's representatives that Mr. Henkin would not complete the sale to Bentley Blum. This came as a surprise to Bentley Blum's representatives, who had been continuing to carry out the terms of the letter of intent. (Exh. 25).
 
 
 83
 Mr. Henkin claims that by the time Skane presented the $500,000.00 offer, he did not have enough time to finalize the deal with Bentley Blum before the October deadline for payment to GECC, and so felt compelled to contract with Skane and avoid losing his personal collateral to GECC. Further, Mr. Henkin claims that the defendants took advantage of the extreme pressure Mr. Henkin received from GECC to sell his companies and the fact that Mr. Henkin would be required to make a substantial payment by August 31, 1985. In support of this, Mr. Henkin submitted a letter dated August 23, 1985 from GECC's representative, Kenneth Sepp, to Mr. Thorne, a copy of which went to Skane's counsel. In that letter, Mr. Sepp stated that based on the representation of GECC's bank that the parties expected to close the sale by September 10, 1985, GECC was extending an August 31, 1985 payment due date to September 10. Mr. Sepp also noted that many prospective buyers had contacted GECC, including the Blum group. Mr. Sepp advised Mr. Thorne that GECC would have to be notified which buyer's offer was accepted, and GECC would have to qualify the buyer before entering serious financing negotiations. Mr. Sepp's letter did not indicate that GECC had a preference for any particular buyer, but Mr. Henkin testified that GECC representatives and Mr. Muskantor told him that he had to sell to Skane or his notes would be accelerated.
 
 
 84
 Following the closing of the sales transaction on October 9, 1985, Mr. Henkin issued a press release calling the sale of his companies "very profitable".
 
 Standard of Review for Summary Judgment
 
 85
 The standards governing summary judgment motions are set forth at pages 5-6 of the May 30, 1990 memorandum and order; those standards govern this motion, as well. The court will address the defendants' motion with those standards in mind.
 
 Constructive Fraud
 
 86
 The defendants claim that Mr. Henkin has not established the elements of a constructive fraud claim, which are:
 
 
 87
 1. a duty owing by the party to be charged to the complaining party due to their relationship,
 
 
 88
 2. violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists,
 
 
 89
 3. reliance thereon by the complaining party,
 
 
 90
 4. injury to the complaining party as a proximate result thereof, and
 
 
 91
 5. the gaining of an advantage by the party to be charged at the expense of the complaining party.
 
 
 92
 * * *
 
 
 93
 * * *
 
 
 94
 Unlike actual fraud, intent to deceive is not an element of constructive fraud. Rather, the law infers fraud from the relationship of the parties and the circumstances which surround them....
 
 
 95
 Pugh's IGA v. Super Food Services, Inc., 531 N.E.2d 1194, 1197 (Ind.App.1988) (citations omitted). Constructive fraud also has been characterized as "fraud that arises by operation of law from conduct which, if sanctioned by the law, would secure an unconscionable advantage.... [I]n order to prevail on a theory of constructive fraud, one need not establish the existence of an actual intent to defraud. The result of the conduct triggers the application of the theory." Lawshe v. Glen Park Lumber Co., 375 N.E.2d 275, 278 (Ind.App.1978).
 
 
 96
 A constructive fraud determination usually focuses on the relationship between the parties. In Sanders v. Townsend, 509 N.E.2d 860 (Ind.App.1987), the plaintiffs claimed that their former attorney coerced them into an inadequate settlement in a personal injury case. Although the attorney was not liable under a negligence theory, summary judgment was reversed on the constructive fraud theory, because the harm to the plaintiffs was not the worth of the underlying claim, but the loss of the right to choose by the weaker party. The court explained the role of the parties' relationship in constructive fraud claims:
 
 
 97
 In cases of constructive fraud, intent to deceive is not required because the parties involved are not at arm's length. The element of intent is replaced by the element of the special relationship between the parties as, for example, the fiduciary relationship. Thus, although the tort of actual fraud vindicates the moral principle one should refrain from representations intended to work a fraud, the tort of constructive fraud vindicates the principle that, in the special relationship encompassed within the purview of the tort, the dominant party must take care not to injure, even inadvertently, the rights of the weaker party, who has relied on the dominant party for expertise, skill, abilities and guidance in an area is which the weaker party is unversed.
 
 
 98
 Sanders v. Townsend, 509 N.E.2d at 866.
 
 
 99
 The party claiming constructive fraud must "be in a position of inequality, dependence, weakness, or lack of knowledge." Nicoll v. Community State Bank, 529 N.E.2d 386, 389 (Ind.App.1988) (quoting Hunter v. Hunter, 152 Ind.App. 365, 283 N.E.2d 775, 779 (1972)).
 
 
 100
 In Pugh's IGA, the plaintiffs brought an action against a market research firm alleging that the defendant's market survey analysis contained fraudulent misrepresentations. Because the plaintiffs were experienced business people with full access to all relevant information at all times, and the parties were doing business at arm's length, the court found as a matter of law that the defendant was not dominant and the plaintiffs were not subordinate, and the plaintiffs had no right to rely on the defendant's projections.
 
 
 101
 Mr. Henkin was an experienced business person who had access to the value of his companies at all times and dealt with Skane and Mr. Muskantor at arm's length. He also had the advice of three professionals with no ties to Skane. As in Pugh's IGA, there is no showing that the parties' relationship generated a special duty to the plaintiff or that Mr. Henkin had a right to rely on any statements of fact by Skane or its representatives. Unlike the plaintiffs in Sanders, Mr. Henkin did not rely on Skane or Mr. Muskantor for their skills or abilities in an area in which he was unversed. He knew more about his own companies than the defendants did. Mr. Henkin claims that the defendants took advantage of his financial situation, but he does not show that he relied on the defendants for any financial advice. He continued to deal with Skane as well as other prospective purchasers at arm's length while relying on the financial and legal expertise of his own professional advisors. Skane continued to receive financial information on the Henkin companies throughout the parties' negotiations, and each disclosure tended to decrease the companies' value. For this reason, the defendants contend that Mr. Henkin could not reasonably expect the purchase price initially considered to remain unchanged during the negotiations.
 
 
 102
 Further, in his deposition, Mr. Henkin claimed to have become aware of a conspiracy between the defendants and GECC before August 27, 1985, but he signed the purchase agreement with Skane anyway and notified Bentley Blum of this agreement. Under these circumstances, it seems impossible to find that a relationship of trust could exist which would entitle Mr. Henkin to rely on any representations by Skane. See Lawlis v. Kightlinger & Gray, 562 N.E.2d 435, 443 (Ind.App.1990) ("[W]here one has full knowledge of an alleged fraud in the inducement yet acts in a manner which shows an intent to confirm the contract, he waives any claim for damages relating to such alleged misrepresentation."); Craig v. ERA Mark Five Realtors, 509 N.E.2d 1144, 1147 (Ind.App.1987).
 
 
 103
 Mr. Henkin claims not to have had full access to all relevant information at all times; he claims he did not know the status of the negotiations because Mr. Muskantor kept from him the price Skane was willing to pay for his companies. He contends he was lulled into believing that Skane would pay more than other prospective buyers and far more than it ultimately paid. The evidence does not show what amount Skane was willing to pay to acquire the Henkin companies or exactly what amount the acquisition cost Skane. Whether the cost Skane was willing to incur to acquire the companies varied after it investigated the status of the companies cannot be determined, but it appears that some of what Skane would have paid in cash to Mr. Henkin had the companies been in better financial condition was shifted into reducing the liabilities the companies had incurred under Mr. Henkin's ownership.
 
 
 104
 What Skane paid was far more than the amount that went to Mr. Henkin in cash at the time of closing; Skane covered Mr. Henkin's loan to GECC, which would have cost him his personal property if not paid, and his liability for an environmental clean up with an estimated cost of $500,000.00. Mr. Henkin had as much knowledge as the defendants of his potential liability and was able, with the aid of his representatives, to negotiate a contract that would reduce his liability. Even if Mr. Henkin had no knowledge of the amount Skane ultimately would pay for his companies, he had knowledge, or access to knowledge, of his companies' worth and his own need to repay his loans. Having negotiated with several prospective purchasers over several months, he was in a position to determine which buyer could provide him a profit and reduce his personal liability.
 
 
 105
 Mr. Henkin makes much of the fact that his attorneys found in Mr. Weil's files a draft that he at first doubted was genuine. This court must draw all reasonable inferences in Mr. Henkin's favor, and this information engenders a reasonable inference that Mr. Henkin's former attorneys failed to disclose information earlier in the course of this litigation.
 
 
 106
 Even so, this does not create an issue of an outcome-determinative fact, absent a showing that Mr. Henkin had a right to rely on the $4.95 million draft and absent a showing that he did so rely. The defendants' undisputed evidence that capable professionals advised Mr. Henkin throughout the negotiations, that he negotiated with several other prospective purchasers, and that he cut off negotiations with Bentley Blum after signing the August 27 contract undermines Mr. Henkin's position that he rightfully relied on the defendants' misrepresentations.
 
 
 107
 The court must infer that Mr. Henkin and his attorney believed that they were to execute a $4.95 million contract when they set out for Chicago in August, 1985. Mr. Henkin contends that a draft of this agreement was sent to him and to GECC shortly before he went to Chicago. At the same time, however, Mr. Freiburg was in the process of drafting the $500,000.00 proposal that was actually presented to Mr. Henkin when he arrived in Chicago. Mr. Henkin claims that when he saw the $500,000.00 draft instead of the $4.95 million draft he was expecting, he became upset and returned to Elkhart.
 
 
 108
 The defendants contend that even if this is true, Mr. Henkin shows no harm. They point out that Mr. Henkin still could have contracted with Bentley Blum, and they show that Bentley Blum representatives were surprised that Mr. Henkin sold the companies to someone else. Mr. Henkin claims that by late August it was too late to complete a sale to Bentley Blum before the time that GECC would call in his loans, but he does not produce evidence of this from Bentley Blum. Mr. Henkin also does not show that GECC would not have extended its due date had he and Bentley Blum informed GECC that they were in serious negotiations and expected to close soon, as GECC did when it learned of the serious negotiations with Skane.
 
 
 109
 Further, the defendants point out the actual practical difference between the $4.95 million proposal, the $500,000.00 proposal, and the executed $1.00 contract. Under the $4.95 million proposal, Skane would have paid Mr. Henkin approximately $500,000.00 and repaid his $932,000.00 promissory notes with interest, but held back $1.75 million as an environmental liability reserve and $1 million as a reserve for accounts receivable. The defendants contend that under this proposal all the money held back would have been claimed by Skane.
 
 
 110
 Under the $500,000.00 proposal, Skane would have paid Mr. Henkin approximately $592,400.00 in cash at closing and repaid the $932,000.00 debt, plus post-closing interest after one year, but only after certain contingent claims were satisfied. The defendants contend that under this proposal all the $932,000.00 would have been claimed by Skane.
 
 
 111
 Under the $1.00 contract, Mr. Henkin actually received approximately $600,000.00 less than he would have under the $4.95 million proposal, and he did not have the potential liability for post-closing claims that he would have had under the other proposals. Mr. Freiburg, who worked on the final draft with Mr. Weil, testified:
 
 
 112
 A [M]y recollection is that the principal thing that they were talking about in terms of language was the indemnity.
 
 
 113
 Q. Explain to me what you mean by that.
 
 
 114
 A. Well, Thorne had mentioned several times that he was concerned that whatever Dan walked away with, that he walked away with, that he couldn't be asked to give back more than he got for his company.
 
 
 115
 We revised the indemnity by August 27th to basically that we could not go back against Dan Henkin for any breach of warranty unless in effect he had committed fraud, and I believe the negotiation of that specific language was with regard to Bill [Thorne] wanting to make sure he got the protection he was looking for.
 
 
 116
 Q. And did you accede to his wishes?
 
 
 117
 A. Well, we signed the contract as it is, so we must have reached agreement as to what the language was going to say.
 
 
 118
 Q. And was it language that Mr. Thorne came up with or language that you came up with?
 
 
 119
 A. I'm sure it was a combination.
 
 
 120
 Freiburg deposition, p. 150.
 
 
 121
 From the drafts of the proposals and the August 27 agreement, as well as from the testimony, it appears that Mr. Henkin achieved his goal of limiting his liability for post-closing costs, even if he received less than he would have liked out of the sale of his companies. It also appears that the sale was a result of a free bargain and not fraud or coercion.
 
 
 122
 Mr. Henkin has not shown that he would have secured better terms from Bentley Blum or another prospective purchaser than he did from Skane. Although others were interested in buying his companies, they also could have insisted on hold backs to secure payment for environmental clean-ups or receivables, and they ultimately could have given Mr. Henkin a small amount for his company in exchange for assuming his liabilities. Mr. Henkin has not shown that his companies were worth more than what it cost Skane to acquire them, accounting for the liabilities Skane assumed. Therefore, he does not show that Skane secured an unconscionable advantage or was otherwise unjustly enriched by the transaction. The result of the parties' conduct does not trigger application of the theory of constructive fraud.
 
 
 123
 Mr. Henkin cites Eby v. York-Division, Borg-Warner, 455 N.E.2d 623 (Ind.App.1983), for the proposition that constructive fraud may be predicated on a promissory misrepresentation. In that case, Larry Eby was employed by Borg-Warner in Indianapolis and sought a position with the firm in Florida. After interviews, he was offered a job by the Florida facility, and he and his wife put their house on the market and moved to Florida. When he reported for work, he was told that the person who hired him was no longer with the company and there was no job for him in Florida.
 
 
 124
 The Ebys sued on several theories, including breach of contract, promissory estoppel, constructive fraud, actual fraud, and negligent misrepresentation. The court found that one of the elements of constructive fraud was missing: the Ebys had not shown that the defendant had gained an advantage from its representations. Although the court affirmed summary judgment in the defendant's favor on the constructive fraud claim, it found that a genuine issue of fact existed as to the promissory estoppel claim. The court noted the elements of promissory estoppel:
 
 
 125
 A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promise[e] and which does induce such action or forbearance is binding if justice can be avoided only by enforcement of the promise.
 
 
 126
 Eby v. York-Division, Borg-Warner, 455 N.E.2d at 627 (quoting Lyon Metal Products, Inc. v. Hagerman Construction Corp., 391 N.E.2d 1152, 1154 (Ind.App.1979)); see also Whiteco Properties, Inc. v. Thielbar, 467 N.E.2d 433, 437 (Ind.App.1984).
 
 
 127
 Mr. Henkin can prevail on a promissory estoppel theory only if he shows that the defendants made a promise that they reasonably could expect to induce him into definite and substantial action or forbearance, that the promise induced such action or forbearance, and that injustice can be avoided only by enforcing the defendants' promise. Various prices were discussed during the parties' negotiations, and the initial price discussed was higher than prices offered by other prospective buyers, but the evidence does not show that Mr. Muskantor or anyone else promised Mr. Henkin that he would eliminate all liability for post-closing costs and still walk away with a large profit. Further, even if Mr. Henkin, an experienced business person, was impressed by the high offer from Skane, the evidence does not show that he could not have continued to seek higher prices or lower liability from prospective buyers.
 
 
 128
 That Mr. Henkin did not cut off negotiations with Bentley Blum until after signing the contract with Skane undermines his argument that a promise induced him into action or forbearance. Further, because the contract Mr. Henkin signed relieved him of personal liability, it does not appear that injustice can only be avoided by enforcement of any "promise" to pay him a higher price for his companies.
 
 
 129
 Although several genuine fact issues surround the parties' negotiations, none of these issues is material. Even if all remaining factual issues are resolved in Mr. Henkin's favor, all the evidence submitted indicates that Mr. Henkin was not in a special relationship of confidence with the defendants and shows no promise that Mr. Henkin would walk away from closing with a sum certain in hand. Even were such a promise made, Mr. Henkin had no right to rely on any early proposals by Skane, and the evidence suggests that he did not rely on any proposals. Further, he has not shown how he was harmed by a contract that relieved him of substantial liability, or that injustice would only be avoided by enforcement of any promise. For these reasons, the defendants are entitled to summary judgment on the issue of constructive fraud.
 
 Actual Fraud
 
 130
 Mr. Henkin's response includes a request to reconsider the order of May 30, 1990 and vacate the summary judgment as to the claim that the defendants committed actual fraud. The elements of actual fraud are:
 
 
 131
 ... a material representation of past or existing facts, which representation is false, made with knowledge or reckless ignorance of its falsity, which causes reliance to the detriment of the person relying upon it. Baker v. American States Ins. Co., (1981) Ind.App., 428 N.E.2d 1342. Fraud cannot be predicated upon acts which by law a party has a right by law to do, nor upon the nonperformance of acts which by law he is not bound to do.
 
 
 132
 First National Bank of Newcastle v. Acra, 462 N.E.2d 1345, 1348 (Ind.App.1984). Mr. Henkin cannot demonstrate justifiable reliance on any alleged misrepresentations by the defendants and he cannot show how the defendants' actions have caused him harm. Therefore, the court will deny the plaintiff's request to reconsider its earlier order and granting summary judgment on the issue of actual fraud.
 
 Conclusion
 
 133
 For the foregoing reasons, the plaintiff's motion to reconsider is DENIED and the defendants' motion for summary judgment is GRANTED.
 
 
 134
 SO ORDERED.
 
 
 135
 /s/ Robert L. Miller, Jr.
 
 Robert L. Miller, Jr., Judge
 United States District Court
 
 136
 cc: May/Johnson
 
 Ham/Moreland/Powers
 Woods
 Kirby/Burton
 DeBaun
 Order Book
 
 
 [1]
 Jurisdiction over defendant General Electric Credit Corporation was also based on diversity, federal question and RICO. That defendant won summary judgment in February 1990, affirmed, Henkin v. General Electric Credit Corporation, 925 F.2d 231 (7th Cir.1991)
 
 
 [2]
 In December 1992, just before oral argument, plaintiff's counsel sent us a letter citing Northern Indiana Public Service Co. v. Stokes, 595 N.E.2d 275 (Ind.App.1992), and Detrick v. Midwest Pipe & Steel, Inc., 598 N.E.2d 1075 (Ind.App.1992), to support his constructive fraud claim. We have examined both of those authorities and determined that neither deals with constructive fraud and that they do not support plaintiff's cause
 
 
 [1]
 That portion of the case is currently on appeal
 
 
 [2]
 Mr. Henkin has submitted the affidavit of Joseph Sharp, his financial consultant, who states that Bernhard Muskantor knew about the EPA problems with the Henkin companies and knew about a required adjustment in the net operating loss tax benefits of the Henkin companies before August 23, 1985. The defendants question how Mr. Sharp has personal knowledge of what Bernhard Muskantor knew and note that knowing about a problem is not the same as knowing the problem's full magnitude and extent
 
 
 [3]
 Section 205 provides: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Comment c states in part: "This Section, like Uniform Commercial Code § 1-203, does not deal with good faith in the formation of a contract."